*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0321p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――――――

KENNETH C. SCHREIBER, et al.,

         *Plaintiffs-Appellants,*

    *v.*

PHILIPS DISPLAY COMPONENTS COMPANY, et al.,

         *Defendants-Appellees.*

No. 07-2440

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-10246—Patrick J. Duggan, District Judge.

Argued: October 23, 2008

Decided and Filed: September 2, 2009

Before: MOORE and WHITE, Circuit Judges; VINSON, District Judge.[*]

―――――――――――――

## COUNSEL

**ARGUED:** David W. Zoll, ZOLL, KRANZ & BORGESS, LLC, Toledo, Ohio, for Appellants. Gregory V. Mersol, BAKER & HOSTETLER LLP, Cleveland, Ohio, for Appellees. **ON BRIEF:** David W. Zoll, ZOLL, KRANZ & BORGESS, LLC, Toledo, Ohio, Lisa M. Smith, KLIMIST, McKNIGHT, SALE, McCLOW & CANZANO, P.C., Southfield, Michigan, for Appellants. Gregory V. Mersol, Todd A. Dawson, BAKER & HOSTETLER LLP, Cleveland, Ohio, for Appellees.

    WHITE, J., delivered the opinion of the court, in which MOORE, J., joined. VINSON, D. J. (pp. 25-26), delivered a separate dissenting opinion.

―――――――――――――

[*]The Honorable C. Roger Vinson, United States District Judge for the Northern District of Florida, sitting by designation.

1

———————————

**OPINION**

———————————

WHITE, Circuit Judge.  Plaintiffs-Appellants Kenneth C. Schreiber, Mary Jane Lambert, and George Vantine appeal the district court's grant of summary judgment to their former employer, Philips Display Components Company (Philips Display or PDC), and related corporations (collectively defendants or Philips), dismissing plaintiffs' claims that Philips breached its collective bargaining agreement (CBA) with, and violated fiduciary duties owed to, plaintiffs when it refused to provide plaintiffs with retiree health benefits.

Plaintiffs raise two arguments on appeal.  First, plaintiffs representing hourly employees argue that the district court both misinterpreted the CBA and failed to properly consider extrinsic evidence in reaching its decision that the parties did not intend retiree health benefits to vest upon retirement.  Second, both hourly and salaried plaintiffs argue that the district court erred in granting summary judgment on plaintiffs' breach of fiduciary duty claim because Philips never properly amended relevant health plans to exclude plaintiffs.

We **REVERSE** and **REMAND**  for further proceedings consistent with this opinion.

**I.  BACKGROUND**

**A.  Parties**

Defendant Philips Electronics North America Corp. (PENAC) manufactures consumer electronics and other products.  Throughout the 1980s and 90s, PENAC

owned a facility in Ottawa, Ohio. Philips Display, a division of PENAC, operated the Ottawa facility, producing cathode ray tubes (CRTs) for television sets.[1]

Plaintiffs are two putative classes or subclasses of Philips Display employees: 1) hourly, union employees who worked at the Ottawa facility and retired on or after July 1, 2001, and 2) salaried, non-union employees who primarily worked at Philips Display's headquarters in Ann Arbor and retired after July 1, 2001. Members of both putative classes contain surviving spouses and/or dependents of hourly and salaried workers.

**B. Hourly Employees: Collective Bargaining Agreement and Plan Documents**

Local 1654 of the International Brotherhood of Electrical Workers (IBEW) represented the Ottawa facility's hourly employees in their contract negotiations with Philips Display. The last CBA between Philips Display and the union, signed in 2000, covered the period from October 2, 2000 to September 28, 2003 (the 2000 CBA).

During negotiations for the 2000 CBA, Philips Display announced that it intended to transfer CRT production from its Ottawa facility to a facility in Mexico. Because the company planned to lay off the majority of its Ottawa-based employees, the 2000 CBA became a plant-closing agreement, guaranteeing 800 jobs at Philips Display for the duration of the contract.

The "Medical Plans" section of the 2000 CBA outlined eligibility criteria for retiree health coverage, stating:

> Employees who retire on or after January 1, 1998, who are at least age fifty-five (55) and who meet the terms of the existing plan are entitled to purchase health insurance coverage on the same terms and at the same employee contribution levels as in effect for active employees.

(Joint Appendix (J.A.) at 343.) Schedule C of the same CBA also provided information regarding "Employee Group Insurance and Benefit Plans":

---

[1] Philips Display took over the facility in 1981. However, other entities apparently manufactured CRTs at the facility before that date.

(A) The group insurance in force upon the signature date of this Collective Bargaining Agreement shall remain in full force and effect until September 28, 2003.

(B) The Company will maintain during the remaining term of this Agreement employee group insurance of the following types: life insurance, non-occupational disability insurance, non-occupational basic medical insurance, non-occupational major medical insurance, and a contributory dental assistance plan as described in the Summary Plan Descriptions distributed to the Union Negotiating Committee on August 3, 1982, as amended . . . .

* * *

(D) During the term of this Agreement, the Company shall have the right to amend in any way, the Plans referenced in this Schedule C, except that no such amendment shall diminish the rights prescribed in the Plans as amended by this Agreement, unless it is necessary to avoid the violation of any law or governmental regulation or to meet requirements which the government may impose, so as to obtain the necessary governmental approvals to place these amendments in effect and to continue them in effect.

(*Id.* at 346.)  Subsection (G) of Schedule C stated that "[n]o matter concerning the Employee Group Insurance Plan or the Pension Plan for Hourly employees or any difference or claim arising thereunder shall be subject to the grievance or arbitration procedure but rather shall be governed by the terms and conditions of such plans." (*Id.* at 347.)

Philips also issued summary plan descriptions (SPDs) that provided extensive information about retiree health benefits.[2]  The SPDs for Philips Display's 2001 Basic/Major Medical Plan and 2001 Comprehensive Medical Plan stated that PENAC was the plan administrator and sponsor and that Philips Personal Access Center for Employees (PACE or Philips PACE) provided "Administrative Services." (J.A. at 384, 404.).  The SPDs outlined requirements for early retirees between ages 55 and 65.  In addition to a requirement that Philips Display have hired such retirees before October 1, 1994, the SPDs dictated that:

---

[2]Despite their name, for all intents and purposes the "summary plan descriptions" are the plan documents in this case.

> To be eligible for this coverage [under the Comprehensive or
> Basic/Major Medical Plan], you must:
>> • Have 15 years of eligibility service, as defined in the
>> company's pension plan
>> • Be receiving pension benefits or have received a lump
>> sum distribution of the entire pension
>> • Be eligible for a company sponsored medical plan
>> immediately prior to retirement

(*Id.* at 381 (Basic Major Medical Plan SPD); *see also id.* at 401 (Comprehensive Medical

Plan).)

 The same plan descriptions provided that:

> Retirees who retire on or after January 2, 1992 will be required
> to contribute towards the cost of their own and their dependants' medical
> coverage.  If a retiree or surviving spouse is receiving a monthly pension
> check sufficient to cover the cost of retiree medical coverage, payment
> will be automatically deducted from the monthly check.  If the monthly
> pension check is not large enough to cover the retiree medical cost, the
> retiree (or surviving dependent) will be direct billed by Benefit One of
> America [the COBRA Administrator].
>
> If the required contributions for retiree and/or dependent coverage
> are not made, retiree and/or dependant medical coverage will terminate.
> Once coverage terminates it will not be available again.

(*Id.* at 381, 401.)

Both SPDs also contained the following clause regarding the "Future Of The

Plan":  "[t]he Company reserves the right to charge for coverage or to end or amend

medical coverage for you or your dependents at any time subject to the provisions of the

applicable collective bargaining agreement."  (J.A. at 383, 403.)

**C.  Salaried Employees:  Plan Documents**

At the time each of the salaried retirees named in this suit retired, one of two

medical plans governed:  the 1999 Philips Retiree Medical Plan (the 1999 Plan) or the

2003 Philips Retiree Medical Program (the 2003 Program).  The 1999 Plan took effect

on January 1, 1999; the 2003 Program controlled from January 1, 2003.  The SPDs for

both plans stated that PENAC was the plan sponsor and administrator and that Philips PACE provided "Administrative Services."[3] (J.A. at 509-10, 526.)

According to the SPDs, to be eligible for healthcare coverage in retirement, salaried employees had to: 1) retire after their 55th birthday and have at least 15 years of eligible service; 2) begin receiving Philips pension benefits immediately after termination of service (or receive a lump sum); 3) be eligible for a company-sponsored medical plan immediately prior to retirement; 4) be in a group covered by the Philips Retiree Medical Program at the time they left the company. (J.A. at 501, 516.) The plans also required salaried retirees to pay contributions in order to maintain their coverage. (*See, e.g.*, *id.* at 515, 516, 518.)

The SPDs explained various situations in which coverage would end, such as when a beneficiary "become[s] ineligible" or "the group plan terminates." (J.A. at 523.) Further, the 1999 Plan contained the following reservation of rights clause:

> Although the company presently intends to continue the plan indefinitely, Philips Electronics North America reserves the right to alter any of its provisions, to change the amount of contributions or to terminate all or any part of it, as the company in its sole discretion deems necessary, without prior notice to any covered person.
>
> Any amendment to the plan, change in the amount of employee or dependent contributions or termination of part or all of the plan shall be effected by a written document executed on behalf of the company.
>
> Termination of coverage under the plan will not prejudice any claim originating before the date of such termination.

(J.A. at 508.)[4]

---

[3] These administrators and sponsors are named despite the fact that, effective July 1, 2001, a new company (LG Philips Displays USA, Inc. (LGP)) took over Philips Display's Ottawa and Ann Arbor facilities. *See infra* Section I.D.

[4] A slightly shorter clause in the 2003 Program provided:

> Although the company presently intends to continue the plan indefinitely, Philips Electronics North America reserves the right to alter any of its provisions, to change the amount of contributions or to terminate all or any part of it, as the company in its sole discretion deems necessary, without prior notice to any covered person. Termination of coverage under the plan will not prejudice any claim originating before the date of

**D.  The Creation of LG Philips Displays USA, Inc.**

In 2001, PENAC's parent company, the Netherlands-based Kobinklijke Philips Electronics N.V. (KPENV), in a transaction with Korea-based LG Electronics (LG), formed LG Philips Displays USA, Inc. (LGP).  As part of the transaction, PENAC conveyed Philips Display's Ottawa facility, along with other assets and liabilities, to LGP, effective July 1, 2001.  This conveyance included employee-related contract obligations and liabilities.

According to defendants, as a result of KPENV's and LG's creation of LGP, "Philips Display employees (including plaintiffs) who worked in Ottawa and Ann Arbor on the effective date of the sale immediately became employees of LGP."  (Final Br. of Defs.-Appellees at 9-10.)  LGP continued to operate the Ottawa facility, through the Ann Arbor office, with the same employees, CBA, and benefits plans.  Defendants assert, however, that LGP employees "left the PENAC-sponsored health insurance programs(s) that had applied to them during their employment with Philips Display, and were advised of that fact in writing both before and after the transaction."  (*Id.* at 10.)

In all relevant aspects, the "new" health insurance plans resembled the Philips Display Plans.  The plan documents stated that PENAC sponsored and administered the plan, though Warren T. Oates, Jr., Senior Assistant Secretary for PENAC, asserted that Philips PACE, an unincorporated office within PENAC, "provided administrative services, for a fee, to LGP," and, under a Local Services Agreement, certain PENAC employees provided record-keeping services to LGP.  (Oates Decl., J.A. at 150; Oates Supp. Decl., J.A. at 180 ("These services included some record keeping, including enrollment forms in connection with retiree medical benefits provided by LGP."); *see*

---

such termination.

(*Id.* at 513, 525.)

*also, e.g.*, Grissmore Dep., J.A. at 647 ("[W]hen we went into the joint venture July 1st, 2001, even though we used the same documents, we had our own separate plans.").)[5]

## E.  LGP's Demise and Plaintiffs' Retirements

After LGP took over Philips Display's operations, the CRT market collapsed and LGP announced that it would be closing the Ottawa facility.[6]  In preparation for this event, LGP and the IBEW created a document entitled "Implementation of Contract Language – Per Ottawa LG Philips Plant Closing" (the Implementation Agreement) for distribution to relevant union employees and human resources personnel.[7]  (*See* J.A. at 360-62.)  LGP and union representatives signed the Implementation Agreement, which sought to clarify any ambiguities regarding the date on which employees would need to retire in order to continue to receive pension and healthcare benefits in their retirement. Under this agreement, employees retiring after the expiration of the CBA, but before the exhaustion of COBRA coverage, were determined to be eligible to receive healthcare coverage under the plans.  The Ottawa plant closed on December 31, 2002.

All plaintiffs submitted retirement applications on or after July 1, 2001 and, at the time of retirement, elected to receive retiree healthcare benefits under one of the plans described above.  The retirees submitted these applications on forms with PENAC headers.  (*See* J.A. 348-59; 542-604.)  Some of the applications also contained an acknowledgment that the retiree understood "that the company necessarily reserves the right to end or amend retiree medical coverage for me or my dependants at any time." (*See, e.g.*, *id.* at 356; 359; 542-46, 549, 551-58).)

---

[5]LGP issued new SPDs in 2005.  These documents indicated LGP was the plan sponsor and administrator and that Philips PACE provided administrative services.

[6]The parties' presentations of facts appear to conflict regarding whether this closure was the completion of PDC's previously announced closure or a new development.  (*Compare* Final Br. of Pls.-Appellants at 13, *with* Final Br. of Defs.-Appellees at 10.)

[7]Depositions indicate that LGP and the union worked together to create the document – which the parties executed on October 18, 2002 – and that Philips PACE distributed it.  (*See* J.A. 687-88 (distribution); 711-12 ("[S]o the union sat with us [LGP representatives] and we looked at trying to simplify and clarify the language and any changes that were reflected in the latest contract . . .").)

On May 10, 2006, LGP sent plaintiffs and class members letters informing them that LGP would be terminating retiree medical plans. Five days later, LGP declared bankruptcy. On May 31, 2006, the company terminated retirees' health benefits.

## F. Procedural Background

In January 2007, plaintiff retirees Schreiber, Lambert, and Vantine brought suit against Philips Display, PENAC, and PACE on behalf of themselves and similarly situated retirees. Schreiber and Lambert purport to represent a class of hourly unionized employees who worked at PDC's manufacturing facility in Ottawa, Ohio. Vantine claims to represent salaried, non-union workers PDC employed at its headquarters in Ann Arbor, Michigan.

Plaintiff hourly retirees sued under the Labor Management Relations Act (LMRA) and the Employee Retirement Income Security Act (ERISA), alleging that their CBA with Philips Display required defendants to continue to provide retiree healthcare benefits. As a result, plaintiffs argued, the termination of benefits breached the parties' CBA. In a separate claim, both hourly and salaried plaintiffs alleged that Philips violated its fiduciary duty to plaintiffs by improperly excluding them from the relevant health benefit plans. Defendants rebutted these arguments, asserting that the documents referenced by Plaintiffs did not provide for vested retiree healthcare benefits, that the decision to transfer retiree health liabilities to LGP did not implicate any fiduciary duties, and that plaintiffs failed to exhaust their administrative remedies. *Schreiber v. Phillips Display Components Co.*, 2007 WL 3036743, at *6 (E.D. Mich. Oct. 16, 2007).[8] After discovery, both parties filed motions for summary judgment.

The district court denied defendants' motion regarding plaintiffs' failure to exhaust administrative remedies, holding that any such exhaustion "would be futile under the circumstances," but granted summary judgment to defendants on the remaining

---

[8]The district court incorrectly captioned the case "Phillips" instead of "Philips."

claims. *Id.* at *8, *15. The court held the CBA unambiguous in its failure to vest retiree healthcare benefits and, therefore, refrained from considering evidence extrinsic to the agreement, including the SPDs that it regarded as extrinsic. The court also found that because defendants' transfer of liabilities for retiree healthcare benefits to LGP was a business decision, plaintiffs' later loss of benefits did not implicate Philips' fiduciary duties under ERISA. Plaintiffs timely appealed.

## II. ANALYSIS

### A. Standard of Review

This action has been brought under section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a),[9] and sections 502(a)(1)(B), 502(a)(3), 502(e)(1), and 502(f) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1)(B), (a)(3), (e)(1), and (f).[10] This court has jurisdiction under 28 U.S.C. § 1291. We review a district court's order of summary judgment de novo. Interpretation of a collective bargaining agreement is a question of law, also subject to de novo review. *See, e.g.*, *Maurer v. Joy Tech., Inc.*, 212 F.3d 907, 914 (6th Cir. 2000).

Rule 56 of the Federal Rules of Civil Procedure states that summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The moving party must inform the district court "of the basis for its motion, and identifying those portions of 'the pleadings,

---

[9]Section 301(a) provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).

[10]The relevant section of 29 U.S.C. § 1132(a) provides that a plan participant or beneficiary may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "In considering a motion for summary judgment, the district court must construe all reasonable inferences in favor of the nonmoving party." *Vill. of Oakwood v. State Bank and Trust Co.*, 539 F.3d 373, 377 (6th Cir. 2008).

**B.  Hourly Plaintiffs' LMRA and ERISA Claims**

Hourly plaintiffs claim their CBA with Philips Display vested employee health benefits and, accordingly, the subsequent termination of retirees' health insurance violated a contract "between an employer and a labor organization representing employees in an industry affecting commerce" under the LMRA. 29 U.S.C. § 185(a). Thus, the LMRA claim – essentially a breach of contract allegation – determines the outcome of the ERISA claim because "[i]f the parties intended to vest benefits and the agreement establishing this is breached, there is an ERISA violation as well as a LMRA violation." *Maurer*, 212 F.3d at 914; *see also Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1298 (6th Cir. 1991).

A retiree health insurance plan "is a welfare benefit plan under ERISA." *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 578 (6th Cir. 2006). In contrast to pension benefits, "[t]here is no statutory right to lifetime health benefits." *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996).[11] Therefore, courts often look to collective bargaining agreements between unions and employers to see if the parties agreed to vest health benefits. *See, e.g.*, *Yolton*, 435 F.3d at 578; *Boyer v. Douglas Components Corp.*, 986 F.2d 999, 1005 (6th Cir. 1993); *see also Sprague v. General*

---

[11]As Judge Martin explained in *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 578 n.4 (6th Cir. 2006):

> ERISA provides for two types of employee benefit plans: pension plans and welfare benefit plans. 29 U.S.C. § 1002(1), (2)(A). Pension plans are subject to mandatory participation, vesting, and funding requirements. 29 U.S.C. § 1051. Welfare benefits are not subject to these requirements. *Id.* Retiree health insurance benefit plans are classified as welfare benefit plans under ERISA. 29 U.S.C. § 1002(1).

*Motors Corp.*, 133 F.3d 388, 400 (6th Cir. 1998 ("To vest benefits is to render them forever unalterable."). If the parties vested health benefits, an "employer's unilateral modification or reduction of those benefits constitutes an LMRA violation." *Yolton*, 435 F.3d at 578.

This court has previously held that while the "enforcement and interpretation of collective bargaining agreements under § 301 is governed by substantive federal law . . . traditional rules for contractual interpretation are applied as long as their application is consistent with federal labor policies." *UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983); *see also Yolton*, 435 F.3d at 578-79. In the benefits context, such an interpretation should focus on the intent of the parties, looking to the "explicit language of the collective bargaining agreement for clear manifestations of intent" and interpreting "each provision in question as part of the integrated whole." *Yard-Man, Inc.*, 716 F.2d at 1479. "When ambiguities exist," courts may also look to other provisions of the CBA and extrinsic evidence for guidance. *Yolton*, 435 F.3d at 579 (citing *Yard-Man, Inc.*, 716 F.2d at 1480); *see also Golden*, 73 F.3d 648 ("The aim in such cases is to settle on an interpretation which is harmonious with the entire agreement."). The CBA, however, need not contain an "explicit intent to vest," in order for courts to find that rights have vested. *Maurer*, 212 F. 3d at 915.

A recent Sixth Circuit opinion aptly summarizes the continuing impact of *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Yard-Man*, 716 F.2d 1476 (6th Cir. 1983), this court's leading case "for determining whether the parties to a CBA intended benefits to vest." *Cole v. ArvinMeritor, Inc.*, 549 F.3d 1064 (6th Cir. 2008). According to *Cole*, *Yard-Man*

> explained that "retiree benefits are in a sense 'status' benefits which, as such, carry with them an inference . . . that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." *Id.* at 1482. With regard to the so-called "*Yard-Man* inference," later decisions of this court have stated that *Yard-Man* does not create a legal presumption that retiree benefits are vested for life. *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 579 (6th Cir. 2006). *Yard-Man* is instead "properly understood as creating such an inference only if the

context and other available evidence indicate an intent to vest." *Noe*, 520
F.3d at 552.

*Id.* at 1069.

Plaintiffs argue that the district court erred in not considering the plan documents in its analysis. The district court held that reference to the SPDs "would be appropriate only if the 2000 CBA was ambiguous as to whether retiree health insurance vested." *Schreiber*, 2007 WL 3036743 at *14 (citing *UAW v. BVR Liquidating Inc.*, 190 F.3d 768 (6th Cir. 1999)); *see also BVR Liquidating, Inc.*, 190 F.3d at 774 ("When a contractual provision is ambiguous, the court may turn to extrinsic evidence to discern the intent of the parties."); *Smith v. ABS Indus., Inc.*, 890 F.2d 841, 846 n.1 (6th Cir. 1989) (considering testimony of retirees – despite it being extrinsic evidence – in order to "resolve the ambiguity" in the contract); *UAW v. Park-Ohio Industries, Inc.*, 1989 WL 63871 (6th Cir. June 15, 1989) (unpublished disposition) ("That both parties have offered plausible interpretations of the agreement drawn from the contractual language itself demonstrates that the provision is ambiguous. Neither of the two proffered interpretations is frivolous nor unreasonable on its face, and inquiry should be permitted into extrinsic circumstances."). Because the district court concluded that "the 2000 CBA contains express, durational language, unambiguously providing retiree medical insurance for its duration," and not beyond, the court refused to consider the SPDs, which it regarded as extrinsic, or any other extrinsic evidence. *Schreiber*, 2007 WL 3036743 at *14. Therefore, as an initial matter, we must examine the district court's decision that the CBA is unambiguous.[12]

---

[12]Plaintiffs also argue that intervening case law limits the meaning of "extrinsic evidence" to "parole evidence of the parties' original understanding of the terms." (Final Br. of Pls.-Appellants at 26 (citing *Prater v. Ohio Educ. Ass'n*, 505 F.3d 437 (6th Cir. 2007); *Yolton*, 435 F.3d 571).) Defined in this manner, extrinsic evidence would not include plan documents, leading the court to review the SPDs alongside the CBA regardless of the latter's ambiguity.

We need not explore this issue. The district court's dispositive holding was that the CBA is unambiguous in its failure to vest retiree health benefits. Because that conclusion was erroneous, the district court should have looked at the SPDs regardless of whether plan documents are properly regarded as extrinsic evidence.

Plaintiffs further assert that the CBA "incorporates" the content of the SPDs via its "specific references to the Plan Documents." (*See* Final Br. of Pls.-Appellants at 27 (listing the CBA's numerous references to the plan documents).) For example, the CBA lists the medical plans available to employees and states that retired employees "who are at least age fifty-five (55) and who meet the terms of the existing plan are

The hourly retirees look to the relevant portions of the CBA to argue that the document is subject to "differing, though reasonable, interpretations." (Final Br. of Pls.-Appellants at 33.) Notably, these are the same portions of the agreement on which the district court relied in finding the document unambiguously did not vest retiree health benefits.

First, the retirees point to the CBA's maintenance and amendment requirements as set forth in Schedule C. The requirements explain, *inter alia*, that "[t]he Company will maintain during the remaining terms of this Agreement employee group insurance of the following types: . . . non-occupational basic medical insurance, non-occupational major medical insurance . . . ." (J.A. at 346.) Plaintiffs assert that the language created a general durational limitation that required the company to maintain the insurance for the period specified, but that it did not address or limit the vesting of those benefits upon retirement. In other words, plaintiffs argue that the clause provides that the insurance benefits must be maintained throughout the life of the CBA; it does not, however, provide that a worker who retires during the life of the CBA will lose those benefits when the CBA expires. In contrast, Philips interprets the clause as a specific durational

entitled to purchase health insurance coverage on the same terms and at the same employee contribution levels as in effect for active employees." (CBA, "Medical Plans," "Retired Employees," J.A. at 342-43.) It also discusses the company's obligations to maintain benefits "as described in the Summary Plan Descriptions," and the procedures for amending and updating the plans. (CBA, Schedule C (B), (D)-(E), J.A. at 346-47.)

These references to the plan documents may be enough to incorporate by reference portions of the SPDs into the CBA. Courts generally cite contract language that is more explicit in its action, though in some cases they have found mere references to SPDs and plan booklets "sufficient to incorporate by reference." *Int'l Ass'n of Machinist and Aerospace Workers v. ISP Chems., Inc.*, 261 F. App'x 841, 847-48 (6th Cir. 2008) (unpublished disposition); *see also* 11 Williston on Contracts § 30:25 (4th ed.) ("Interpretation of several connected writings"). *Compare Yolton*, 435 F.3d at 580 (looking to a durational clause in the CBA stating "the insurance plan 'will run concurrently with [the CBA] and is hereby made part of this Agreement'" (quoting the CBA)), *and Int'l Union, UAW v. Aluminum Co. of Am.*, 932 F. Supp. 997, 1001 (N.D. Ohio 1996) ("Separate booklets describing these benefits are incorporated herein and made a part of this Agreement."), *with Bailey v. AK Steel Corp.*, 2006 WL 2727732 at *1 (S.D. Ohio Sept. 22, 2006) (unpublished disposition) ("Each CBA incorporates by reference the health benefit plan . . .").

Thus, the district court would have been on solid ground had it interpreted the SPDs alongside the CBA before reaching the ambiguity issue. Since it did not do so, however, we reverse the district court's decision that the provisions within the four corners of the CBA unambiguously did not vest retiree health benefits.

limitation on the benefits themselves, even after retirement.   (Final Br. of Defs.-Appellees at 17.)[13]

Both parties cite *Gilbert v. Doehler-Jarvis, Inc.*, 87 F. Supp. 2d 788, 791 (N.D. Ohio 2000).  The *Gilbert* court held that the clause in question – which provided that "[t]his Insurance Program shall continue in effect until termination of the collective bargaining agreement of which this is a part" – "referr[ed] to the duration of the *agreement*, as opposed to the duration of the *benefits described in that agreement*." *Id.* (emphasis in original). While we do not know the full context of the *Gilbert* "Insurance Program," other case law explains that "[a]bsent specific durational language referring to *retiree* benefits themselves, courts have held that the general durational language says nothing about those *retiree* benefits." *Yolton*, 435 F.3d 581 (emphasis added); *see also Cole*, 549 F.3d at 1074 ("*Yolton* requires that a durational limitation must include a specific mention of retiree benefits in order to apply to such benefits."); *Noe v. Polyone Corp.*, 520 F.3d 548, 554 (6th Cir. 2008).

The clause at issue here can be understood either to relate to the duration of the listed benefits, or to the agreement itself.  *See Gilbert*, 87 F. Supp. 2d at 791. Nonetheless, like the agreements in *Yolton* and *Noe*, there is no language in the CBA that specifically states retiree benefits expire upon the termination of the agreement, and therefore the durational provision alone does not manifest a lack of intent to vest healthcare benefits upon retirement.  *Yolton*, 435 F.3d at 581; *see also Noe*, 520 F.3d at 554 (noting that the contract language does not state that retiree benefits expire but, rather, "speaks generically of all benefits for all employees").  We conclude that the district court erred under our precedent in construing the CBA as including a specific durational clause limiting retiree healthcare benefits to the duration of the CBA.[14] *Noe*,

---

[13]Philips also claims an arbitrator has already decided this issue in their favor. *See infra*.

[14]Furthermore, as plaintiffs point out, the CBA uses similar language when discussing pension benefits, which do vest, and does apply specific durational limitations to disability retirees. (J.A. at 343, 346.)  *See Noe v. Polyone Corp.* , 520 F.3d 548, 562-63 (6th Cir. 2008) ("The presence of specific durational language in other provisions and its absence in the retiree health benefits provisions suggests an intent to vest under our case law."); *Yolton*, 435 F.3d 571, 581 (noting plaintiffs' argument that "because pension plans are vested benefits and because the CBA uses the same durational language for

520 F.3d at 554; *see also Maurer*, 212 F.3d at 919  (holding a reservation of rights clause was effective against vesting because the language "clearly included retirees and was distributed to them").

The district court also relied on the "Medical Plans" section of the CBA – which refers to *retirees* "who meet the terms of the existing plan" and are, therefore, "entitled to purchase health insurance coverage on the same terms and at the same employee contribution levels as in effect for active employees" – in accepting Philips' argument that the CBA only guaranteed retiree benefits for the duration of the agreement. According to defendants, this language "recognized that retirees would not receive any set level of benefits but, instead, would only be entitled to those benefits" of active employees at the Ottawa facility.  (Final Br. of Defs.-Appellees at 24.)  Plaintiffs, however, argue that this clause was a "shorthand way to describe the varying rates of contribution" available to retirees.  (Final Br. of Pls.-Appellants at 34.)

The "Medical Plans" section is not a model of clarity with regard to whether retiree health benefits vest.  While the court could interpret the language only to provide benefits available to active employees at any moment in time, this is not the most obvious interpretation, and the provision does not provide a "clear manifestation of intent" that the benefits should or should not vest.  *Yard-Man*, 716 F.2d at 1479-82. Analyzing a similar provision, this court held that "[t]he language 'will provide insurance benefits equal to the active group' could reasonably be construed, if read in isolation, as either solely a reference to the nature of retiree benefits or as an incorporation of some durational limitation as well."  *Id.* at 1480.  Because Schedule C is silent regarding retiree benefits and the "Medical Plans" section is ambiguous, the district court erred in concluding that the CBA unambiguously states that Philips only "agreed to provide retirees 'basic' and 'major' medical insurance for the duration of the 2000 CBA."  *Schreiber*, 2007 WL 3036743 at *14.

---

pension plans that it uses for the health care benefits, the health care benefits also must be vested benefits").

Philips also argues that a prior arbitration opinion collaterally estops plaintiffs from asserting that the CBA is ambiguous on the relevant issue. In an arbitration proceeding between the IBEW and Philips Display, the arbitrator held that Philips had no obligation to provide life insurance benefits to retirees who retired after the expiration of the CBA. According to Philips, plaintiffs' claims here amount to a collateral attack on the arbitrator's decision. *Cf. Hitchens v. County of Montgomery*, 98 F. App'x 106, 114 (3d Cir. 2004) (unpublished disposition) ("[D]ecisions against a union can bind members in a subsequent action").

There is significant precedent holding that an arbitrator's decision has preclusive effect in federal court. *See, e.g.*, *Cent. Transp., Inc. v. Four Phase Sys., Inc.*, 936 F.2d 256, 257 (6th Cir. 1991) (upholding a district court's grant of summary judgment because "plaintiffs' remaining claims were based on facts already determined in favor of the defendants by the arbitration panel"). Defendants, however, do not address the four elements of collateral estoppel. *Cent. Transp., Inc.*, 936 F.2d at 260. Defendants merely state that the arbitrator considered this court's *Yard-Man* decision and still rejected the union's argument that "LGP was required to provide insurance benefits to retirees after the expiration of the Ottawa contract." (Final Br. of Defs.-Appellees at 19.) Yet the elements of collateral estoppel require that:

> (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding; (2) determination of the issue must have been necessary to the outcome of the prior proceeding; (3) the prior proceeding must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 650 (6th Cir. 2007); *see Bull v. United States*, 63 Fed. Cl. 580, 590 (Fed. Cl. 2005) (rejecting the argument "that because 'the individual plaintiffs enjoyed the opportunity, through their union, to argue the question as to what statute authorizes the payment of overtime,' collateral estoppel is appropriate," as the issues in both cases "must be identical to merit preclusive effect"

(quoting *Shell Petroleum, Inc. v. United States*, 319 F.3d 1334, 1338 (Fed. Cir. 2003)) (internal citations omitted)).

The arbitrator's decision addressed Philips' obligation to provide *life insurance* to employees who retired *after* the expiration of the contract. (*See* J.A. at 230-33.) Significantly, the putative hourly class here is not limited to those who retired after the expiration of the contract but, rather, to those who retired after June 30, 2001. Further, although the durational clause is the same, the CBA contains separate and distinct clauses addressing health insurance coverage for retirees and life insurance coverage for retirees. Also, the arbitrator's decision was based on testimony as well as the CBA.[15] While the district court may conclude on remand that portions of plaintiffs' claims are barred by collateral estoppel, Philips has not established that the court's decision should be upheld on this alternative ground.[16] It does not appear that the arbitrator ever decided whether the durational provisions were general or specific, nor did he decide whether benefits vested for retirees who retired before the expiration of the CBA. He merely held that since there were no provisions in the contract extending the company's obligation to provide life insurance to retirees who retired after the expiration of the contract, the durational provisions terminated that obligation on September 28, 2003. (J.A. at 234.)

The district court erred in concluding that the relevant provisions of the CBA are unambiguous and failing to consider the SPDs and extrinsic evidence. Thus, we reverse and remand the hourly plaintiff's LMRA and ERISA claims.[17]

---

[15]Interestingly, in the arbitration proceedings Philips relied, *inter alia*, on the Implementation Agreement's failure to reference retiree life insurance benefits. (*See* Arbitration Award at 25-26, *Schreiber*, No. 07-10246 (Docket #40-5), 2007 WL 3036743.) That agreement is one of the pieces of extrinsic evidence plaintiffs tried to present to the district court.

[16]The district court did not address this issue in its opinion granting summary judgment.

[17]In their briefs and at oral argument, the Philips companies assert that they are not the proper defendants because LGP assumed PENAC's assets and liabilities before plaintiff retirees retired. *See supra* Section I.D. When defendants raised this argument below, however, plaintiffs responded by alleging that Philips et al. is LGP's alter ego.

The district court did not reach this issue, deciding the case based on the CBA alone. We also limit our analysis to the CBA, allowing both parties' arguments to remain viable on remand.

## C. Salaried and Hourly Plaintiff Retirees' ERISA Breach of Fiduciary Duty Claim

Hourly and salaried plaintiffs allege Philips failed to properly exclude plaintiffs from its retiree health benefit plans and that, as a result, defendants' subsequent refusal to provide plaintiffs with retiree health benefits is a breach of fiduciary duty.

Because a retiree health benefits plan "is a welfare benefit plan under ERISA," numerous federal statutes regulate such plans. *Yolton*, 435 F.3d at 578. These statutes, among other things, establish:  1) the requisite features of a welfare benefit plan (29 U.S.C. § 1102); 2) the responsibilities and duties of a welfare plan fiduciary (29 U.S.C. § 1104 (a)); and 3) the responsibilities of a welfare plan administrator with regard to providing and amending summary plan descriptions (29 U.S.C. § 1022; 29 U.S.C. § 1024(b)(1)).

According to ERISA, specific fiduciary duties include an obligation to "discharge . . . duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104.  Further, the fiduciary must undertake these duties for the exclusive purpose of "providing benefits to participants and their beneficiaries . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.*; *see also* 29 U.S.C. § 1002 (21) (defining a plan fiduciary).

Despite this broad language, however, "a corporation's fiduciary duties under ERISA do not encompass all of its activities." *United Steelworkers of Am. v. Cyclops Corp.*, 860 F.2d 189, 198 (6th Cir. 1988).  This is because "[a]n employer that also acts as a plan administrator is said to wear 'two hats'" and "[o]nly when the employer acts in its fiduciary capacity must it comply with ERISA's fiduciary duties." *Sengpiel v. B.F. Goodrich Co.*, 156 F.3d 660, 665 (6th Cir. 1998).  As this court explained in *Sengpiel v. B.F. Goodrich Co.*,

> . . . courts have typically distinguished between employer actions that constitute "managing" or "administering" a plan and those that are said

to constitute merely "business decisions" that have an effect on an ERISA plan; the former are deemed "fiduciary acts" while the latter are not. It is firmly established, for example, that "a company does not act in a fiduciary capacity when deciding to amend or terminate a welfare benefits plan." *Sutter v. BASF Corp.*, 964 F.2d 556, 562 (6th Cir.1992) (quoting *Adams v. Avondale Indus., Inc.*, 905 F.2d 943, 947 (6th Cir.1990)); *see also Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995) ("Employers or other plan sponsors are generally free under ERISA for any reason at any time, to adopt, modify, or terminate welfare plans.").

*Id.* Based on this analysis, *Sengpiel* held that an employer's "transfer of the retirees' welfare benefits is more analogous to amending, modifying, or terminating the then-existing welfare plans than to administering or managing them." *Id.* As a result, defendant-employer's transfer of benefits to another entity, and that entity's later termination of benefits, could not amount to a breach of fiduciary duty. *Id.*

Plaintiffs concede that Philips would not act in a fiduciary capacity if it amended, transferred, or terminated the retiree health benefits plans. *Adam v. Avondale Indus., Inc.*, 905 F.2d 943, 947 (6th Cir. 1990); *see also Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995) ("Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare benefit plans."). Further, plaintiffs do not dispute that the reservation of rights clauses in all four relevant plans set forth an appropriate "procedure for amending such plan[s]."[18] 29 U.S.C. § 1102(b)(3); *Schoonejongen*, 514 U.S. at 77-79 (1995) (holding that a clause reserving the company's right "at any time to amend the plan" meets the requirements of 29 U.S.C. § 1102(b)(3)).

---

[18]Of course, as to the hourly employee-plaintiffs, this concession is relevant only to the procedure for amending the plan because the substantive right to amend the plan is made explicitly subject to the provisions of the CBA. Also, in contrast to the 2001 Basic/Major and Comprehensive Plans for hourly employees and the 2003 Program for salaried employees, the 1999 Plan for salaried employees did not merely reserve the right to "end or amend" coverage. (*See* J.A. at 383, 403, 525). It also stated that any amendment "shall be effected by a written document executed on behalf of the company." (J.A. at 508.) Therefore, with regard to the 1999 Plan, plaintiffs also allege that Philips failed to discharge its duties "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D).

The retirees argue that: 1) because non-party retirees who retired before July 1, 2001 still receive benefits, the plans are not terminated;[19] 2) this means Philips had to amend or modify the plans to exclude plaintiff retirees; 3) defendants failed to comply with the ERISA procedures for amending or modifying the plans; 4) defendants failed to comply with their own procedures for amending the 1999 Plan for salaried employees; and 5) defendants' failure to properly exclude plaintiffs from its plans before refusing to provide health benefits makes its refusal a breach of fiduciary duty. *See* 29 U.S.C. § 1022 ("Summary plan description); 29 U.S.C. § 1024 ("Filing and furnishing of information"); 29 U.S.C. § 1104 ("Fiduciary duties").[20] In this manner, plaintiffs do not

---

[19]There appears to be a factual dispute on this issue. Plaintiffs assert that the plans must still exist since non-party retirees who retired before July 1, 2001 still receive benefits. Defendants, however, point to the Supplemental Declaration of PENAC Senior Assistant Secretary Warren T. Oates (the Oates Supp. Decl.) stating "[n]o programs providing such [retiree medical] benefits before July 1, 2001 are still in existence. Currently, the only PENAC-sponsored program providing such benefits is the Philips Retiree Preferred Provider Organization Medical Program." (J.A. at 179.)

Nevertheless, as the district court pointed out,

> To the extent that Defendants argue that Plaintiffs' first theory of liability must fail because they are not eligible for any of the plans they claim are still in existence, this Court believes that Defendants misconstrue Plaintiffs' arguments. Plaintiffs are arguing that Defendants are still providing benefits to former employees of Phillips who retired on or before June 30, 2001 under the same or substantially similar plans as those in existence at the time of Plaintiffs' retirements. Thus, according to Plaintiffs, Defendants are obligated to provide Plaintiffs, individuals who retired after June 30, 2001 those same benefits. Defendants' failure to do so, Plaintiffs' claim, resulted in a breach of their fiduciary duties under ERISA.

*Schreiber*, 2007 WL 3036743 at *9.

[20]29 U.S.C. § 1022 provides, in part:

> (a) A summary of any material modification in the terms of the plan and any change in the information required under subsection (b) of this section shall be written in a manner calculated to be understood by the average plan participant and shall be furnished in accordance with section 1024(b)(1) of this title. . . .

> (b) The summary plan description shall contain the following information:  . . . the plan's requirements respecting eligibility for participation and benefits; a description of the provisions providing for nonforfeitable pension benefits; circumstances which may result in disqualification, ineligibility, or denial or loss of benefits; the source of financing of the plan and the identity of any organization through which benefits are provided; the date of the end of the plan year and whether the records of the plan are kept on a calendar, policy, or fiscal year basis . . .

29 U.S.C. § 1024(b) provides, in part:

> Notwithstanding the foregoing, the administrator shall furnish to each participant, and to each beneficiary receiving benefits under the plan, the summary plan description described in section 1022 of this title every tenth year after the plan becomes subject to

attack the non-fiduciary decision to transfer or terminate benefits; rather, plaintiffs base their claims on Philips' failure to properly amend the plan according to its own stated procedures and "furnish to each participant, and each beneficiary receiving benefits under the plan, a copy of the summary plan description, and all modifications and changes." 29 U.S.C. § 1024(b); *see also* 29 U.S.C. § 1022(a) ("A summary of any material modification in the terms of the plan and any change in the information required under subsection (b) of this section shall be written in a manner calculated to be understood by the average plan participant and shall be furnished in accordance with section 1024(b)(1) of this title.").[21]

---

this part. If there is a modification or change described in section 1022(a) of this title (other than a material reduction in covered services or benefits provided in the case of a group health plan (as defined in section 1191b(a)(1) of this title)), a summary description of such modification or change shall be furnished not later than 210 days after the end of the plan year in which the change is adopted to each participant, and to each beneficiary who is receiving benefits under the plan. If there is a modification or change described in section 1022(a) of this title that is a material reduction in covered services or benefits provided under a group health plan (as defined in section 1191b(a)(1) of this title), a summary description of such modification or change shall be furnished to participants and beneficiaries not later than 60 days after the date of the adoption of the modification or change.

[21]While plaintiff retirees admit that LGP eventually issued new SPDs in 2005, they claim that defendants, as administrators and fiduciaries under the prior plan, were still responsible for amending or modifying the Philips SPDs to *exclude* plaintiffs. *See* 29 U.S.C. § 1104(a)(1) ("[A] fiduciary shall discharge his duties with respect to a plan . . . in accordance with the documents and instruments governing the plan."). In *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 79 (1995), the Supreme Court analyzed an amendment procedure similar to the reservations of rights clauses used in the Philips SPDs (e.g., a clause reserving the right of "the company" to make any future changes), and held that "[t]o say that one must look always to '[t]he Company' is to say that one must look only to '[t]he Company' and not to any other person – that is, not to any union, not to any third-party trustee, and not to any of the other kinds of outside parties that, in many other plans, exercise amendment authority." Plaintiffs use this holding to argue that the LGP issuance is irrelevant because "[o]nly Philips, by a document in writing, could modify its Plan so as to eliminate coverage for its plan participants." (Final Br. of Pls.-Appellants at 56.)

Philips claims that when it transacted with LG Electronics to pass control of the Ottawa facility to LGP, plaintiff "employees left the PENAC-sponsored health insurance program(s) that had applied to them during their employment with Philips Display, and were advised of that fact in writing, both before and after the transaction." (Final Br. of Defs.-Appellees at 10; *see also* J.A. at 190 ("Following the change in operational control of the Ottawa Facility, the health insurance benefits were unilaterally transferred and provided through LGPD Welfare Plans" (Aff. of John Benjamin)).) Defendants' support for this statement is a paragraph in the Oates affidavit that merely declares:

10)     Philips display had no employees after that time [LGP's purchase of the Ottawa facility], and ceased to employ any of the individuals at either its Ottawa, Ohio or Ann Arbor, Michigan sites. As of July 1, 2001, none of the former employees of Philips Display who became LGP employees were participants in any PENAC-sponsored health insurance plan. Rather, those individuals became covered by plans offered by LGP. No former PDC employee who retired after June 30, 2001 elected retiree health coverage under

Defendants respond to this allegation by pointing out that:  1) Philips no longer employed plaintiffs when they elected to receive benefits and 2) immediately prior to retirement, plaintiffs were not covered by a PENAC-sponsored plan as required in the Philips SPDs' eligibility sections.  Rather, plaintiffs were covered by an LGP plan, and LGP, not PENAC, failed in its obligation to timely publish an updated SPD.  (Final Br. of Defs.-Appellees at 39.)  Further, even if LGP's continued use of PENAC and PDC documents misled plaintiffs, LGP's eventual issuance of new SPDs – identifying itself as plan administrator and sponsor – should have eliminated any confusion.[22]

The district court disposed of this claim by noting that "any breach of fiduciary duty by Defendants must come from the decision, by Defendants' parent company, to transfer the assets and liabilities of PDC to LGP."  *Schreiber*, 2007 WL 3036743, at *10. Because this act was "part of a business decision implemented by their parent company," the district court held that "Defendants did not breach an ERISA fiduciary duty when Plaintiffs [sic] retiree health care benefits were terminated."  *Id.*  However, the fact that Philips' decision to transfer assets was not a fiduciary one under ERISA does not mean that it did not trigger ERISA obligations.  While it "is firmly established . . . that 'a company does not act in a fiduciary capacity when deciding to amend or terminate a welfare benefits plan,'" ERISA still provides instructions as to *how* an employer should properly amend or terminate a plan.  29 U.S.C. § § 1022, 1024(b); *see Sengpiel*, 156 F.3d at 665-66; *Schoonejongen*, 514 U.S. at 84 ("[W]e do not mean to imply that there is anything wrong with plan beneficiaries trying to prove that unfavorable plan

---

any PENAC-sponsored plan.  No former PDC employee who retired after June 30, 2001 elected health coverage for his or her dependants under any PENAC-sponsored retiree medical plan.

(J.A. at 150.)  Plaintiffs, however, point out that there is "simply no document in the record that purports to be a modification, amendment or termination of the Retiree Plan under which the Retirees retired and initially received benefits."  (Final Br. of Pls.-Appellants at 57.)

[22]LGP issued these SPDs in 2005.  Yet between LGP's takeover in 2001 and LGP's issuance of the SPDs in 2005, plaintiffs did not receive updated SPDs and received health insurance-related documents identifying PDC and PENAC as the parties administering benefits. Defendants admit "that PACE, for a fee, provided administrative services to LGP for a period of time after the sale of the Ottawa plant."  (Final Br. of Defs.-Appellees at 40).  Yet they claim that the continued use of Philips documents was due to "technical violations by LGP," not Philips.  (*Id.* at 39-40.)

amendments were not properly adopted and are thus invalid. This is exactly what respondents are trying to do here, and nothing in ERISA is designed to obstruct such efforts.")

Thus, even if Philips' transfer of assets in this case was not a "fiduciary act," it must still comply with ERISA procedures. Because the district court did not address the issue below and the facts are insufficiently clear to permit us to do so here, we remand for further proceedings.

## III.  CONCLUSION

For the aforementioned reasons we **REVERSE** the district court's order granting summary judgment and **REMAND** for proceedings consistent with this opinion.

_____

**DISSENT**
_____

VINSON, District Judge, dissenting. I believe the record fully supports summary judgment for the defendants, and I would affirm on the basis of the district court's well-reasoned decision.

First, with respect to the hourly employees, there is nothing in the CBA which vests medical coverage. In fact, the durational language indicates the opposite, and I agree with the district court that there is no ambiguity in the CBA.[1] But, even if we were to look at the SPDs alongside the plan itself (just as part of the plan documents, and not as extrinsic documents to resolve the purported ambiguity), that would not change the result. If anything, it seems to me that the SPDs actually strengthen the defendants' case. The SPDs make it very clear, for example, that coverage may end or be changed "at any time," subject only to the CBA.

The salaried employees' claim is even more attenuated. These plaintiffs do not contend that they are entitled to lifetime health benefits, and under *Sprague v. General Motors Corp.,* 133 F.3d 388 (6th Cir. 1998) (en banc), it is clear that they are not. *Id.* at 400 (explaining that because vested benefits are "forever unalterable" and not required by law, an employer's commitment to vest welfare benefits "is not to be inferred lightly; the intent to vest 'must be found in the plan documents and must be stated in clear and express language") (citations omitted).

In an effort to get around these legal barriers, the plaintiffs contend (and the majority apparently agrees) that there is a genuine issue of material fact on the record as developed that the defendants breached its fiduciary duty under ERISA. However, I believe *Sengpiel v. B.F. Goodrich Co.,* 156 F.3d 660 (6th Cir. 1998) forecloses this claim. To the extent the plaintiffs claim that liability should attach because Philips did

---

[1]The arbitration decision between IBEW and Philips Display (which addressed the same durational clause) provides further support for this conclusion.

not amend its plan to specifically exclude them, the argument is equally without legal or factual merit. After the transfer of ownership, LGP immediately started administering the plans and eventually issued its own SPDs. The defendants rightly point out:

> PENAC was ***not*** acting in a fiduciary capacity in transferring its retiree health liability to LGP, a fact that plaintiffs expressly do not dispute (*see* Pls. Br.) *See Sengpiel,* 15[6] F.3d at 666. Nor did it become liable for the obligations incurred afterwards by LGP's new managers. *Id.*; *Darnel v. East,* 573 F.2d 534, 538-39 (8th Cir. 1978). Once that liability was transferred, PENAC had no need to amend its retiree health program to exclude plaintiffs, since it was no longer liable for their retiree health care.

The district court thus held: "In this case, any breach of fiduciary duty by Defendants must come from the decision, by Defendants' parent company, to transfer the assets and liabilities of PDC to LGP. By being part of a business decision implemented by their parent company, Defendants did not breach an ERISA fiduciary duty when Plaintiffs retiree health care benefits were [later] terminated."

In sum, Philips ceased to be the plaintiffs' employer after June 30, 2001. The plaintiffs subsequently retired from LGP, and it was five years later --- after LGP's Chapter 7 bankruptcy proceeding resulted in a termination of its retiree health benefits --- that the plaintiffs sought to turn back the clock and seek lifetime health benefits from Philips. There are no genuine issues of material fact and, in my opinion, Philips is entitled to judgment as a matter of law. Therefore, I respectfully dissent.