*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0277p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

ROBERT MOORE; ELEANOR RHODES;
GUSTAVE PEPPEL; VICTOR ADAMS; MARJORIE
MOORE; LORRAINE PEPPEL; NAOMI ADAMS;
UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY, ALLIED
INDUSTRIAL AND SERVICE WORKERS
INTERNATIONAL UNION AFL-CIO-CLC,
⎫
⎪
⎪
⎪
⎬
⎪
⎪
⎪
⎭

Nos. 10-2171/2173

　　　　*Plaintiffs-Appellants/Cross-Appellees*,

　　　　　*v.*

MENASHA CORPORATION,
　　　　*Defendant-Appellee/Cross-Appellant.*

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:08-cv-1167—Robert Holmes Bell, District Judge.

Argued: March 7, 2012

Decided and Filed: August 22, 2012

Before: CLAY and KETHLEDGE, Circuit Judges; DOW, District Judge.[*]

_____

### COUNSEL

**ARGUED:** Stuart M. Israel, LEGGHIO & ISRAEL, P.C., Royal Oak, Michigan, for Appellants/Cross-Appellees. Brian M. Schwartz, MILLER CANFIELD, PADDOCK and STONE, P.L.C., Kalamazoo, Michigan, for Appellee/Cross-Appellant. **ON BRIEF:** Stuart M. Israel, LEGGHIO & ISRAEL, P.C., Royal Oak, Michigan, William H. Schmelling, UNITED STEELWORKERS, Bridgeview, Illinois, for Appellants/Cross-Appellees. Brian M. Schwartz, Pamela C. Enslen, Charles S. Mishkind, MILLER CANFIELD, PADDOCK and STONE, P.L.C., Kalamazoo, Michigan, for Appellee/Cross-Appellant.

_____

[*]The Honorable Robert M. Dow, Jr., United States District Judge for the Northern District of Illinois, sitting by designation.

_____

**OPINION**

_____

CLAY, Circuit Judge.  In this civil action, Plaintiffs are a group of retired employees, their spouses, and their union, who allege that their former employer, Defendant Menasha Corporation ("Menasha"), violated the terms of two collective bargaining agreements ("CBA"s) by denying the employees and their spouses lifetime vested healthcare coverage following the employees' retirement.  Plaintiffs allege that by reneging on the terms of the CBAs, Defendant violated § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and § 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132.  On cross-motions for summary judgment, the district court issued a split decision that ruled in Plaintiffs' favor as to employee coverage and in Defendant's favor as to spousal coverage.  For the reasons that follow, we **REVERSE** and **REMAND** for entry of judgment in favor of Plaintiffs, in accordance with this opinion.

**BACKGROUND**

Defendant is a "privately held, family-owned company [] engaged in the business-to-business service of niche-based packaging, marketing, and logistics." Although Defendant is headquartered in Wisconsin, it also operates a small plant out of Coloma, Michigan.  Plaintiffs Robert Moore, Eleanor Rhodes, Gustave Peppel, and Victor Adams are retired employees of Defendant's Coloma facility and members of the Union.[1]  Their spouses are the other named plaintiffs: Marjorie Moore, Lorraine Peppel, and Naomi Adams.  Between 1994 and 2002, the Union and Defendant negotiated two CBAs, one in effect from June 16, 1994 to June 16, 1997 (the "1994 CBA"), and one in effect from June 16, 1997 to June 16, 2002 (the "1997 CBA").  The CBAs contained

_____

[1]During their employment, the employees were members of United Paperworkers International Union ("UPIU"), a predecessor of United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International ("USW").  The parties agree that USW is the successor-in-interest of the relevant CBAs negotiated between Defendant and UPIU. For simplicity's sake, we refer to USW as "the Union."

several provisions addressing healthcare benefits available to Menasha employees. As covered in more detail below, the parties contest whether certain of these provisions guaranteed the  employees and their spouses lifetime vested healthcare benefits after retirement.

Moore, Rhodes, and Peppel each retired from Menasha at age 62, during the term of the 1994 CBA. Adams also retired from Menasha at age 62, but during the term of the 1997 CBA. Prior to retiring, Rhodes and Adams claim they spoke with Menasha human resources representatives who assured them that the company would be funding lifetime healthcare insurance for them and their spouses.

After retiring, the employees and spouses did in fact continue to receive healthcare insurance from Defendant through a plan issued by Blue Cross Blue Shield of Michigan (the "BCBS Plan"). Between ages 62 to 65, Defendant paid 80% of the employees' and spouses' healthcare insurance premium costs. When the retirees turned 65, Defendant assumed 100% of their premium costs. Over the ensuing years, Defendant sent various communications to Plaintiffs detailing their healthcare benefits, including letters, benefit booklets, and summary plan descriptions. Defendant paid the healthcare insurance premiums without interruption through October of 2006.

However, in mid-October of 2006, Defendant informed Plaintiffs that the company was instituting a new healthcare plan to "replace the offerings in place currently for all [its] Coloma retirees," to take effect on January 1, 2007. Defendant announced that it would no longer cover 100% of the healthcare insurance premiums, but instead, that the company's contribution would decrease in accordance with the following schedule: from January 1, 2007 to April 30, 2008, each retiree would pay $60 per month towards his or her healthcare insurance premium, with Defendant paying the remainder; from May 1, 2008 to April 30, 2009, each retiree would pay $120 per month; and finally, from April 30, 2009 forward, Defendant would only pay $100 per month, with the retiree assuming the remainder.

Plaintiffs responded by filing a two-count lawsuit, alleging violations of LMRA § 301 and ERISA § 502(a)(1)(B). Defendant moved to dismiss the case pursuant to

Rules 12(b)(7) and 19 of the Federal Rules of Civil Procedure, or to transfer the case to an alternate forum, pursuant to 28 U.S.C. § 1404(a).  Defendant argued that the case ought to be dismissed for failure to join a necessary and indispensable party to the action, namely, the healthcare benefit plan.  The district court denied the motions, and Defendant does not appeal that decision.  *See Moore v. Menasha*, 634 F. Supp. 2d 865 (W.D. Mich. 2009) ("*Moore I*").  The parties then filed cross-motions for summary judgment, and the district court heard argument on June 29, 2010.  On July 15, 2010, the district court issued an opinion, order, and judgment granting in part and denying in part the cross-motions, finding in favor of Plaintiffs as to employee coverage and in favor of Defendant as to spousal coverage.  *Moore v. Menasha*, 724 F. Supp. 2d 795 (W.D. Mich. 2010) ("*Moore II*").  Plaintiffs moved for reconsideration of the spousal coverage issue, which was denied.  *Moore v. Menasha*, No. 1:08-CV-1167, 2010 WL 3210760 (W.D. Mich. Aug. 10, 2010) ("*Moore III*").

The parties filed timely notices of appeal on September 8, 2010.  Original jurisdiction exists pursuant to 28 U.S.C. § 1331.  This Court takes jurisdiction under 28 U.S.C. § 1291.

**DISCUSSION**

**I.      Standard of Review**

This Court reviews a district court's summary judgment decision *de novo*. *Schreiber v. Philips Display Components Co.*, 580 F.3d 355, 363 (6th Cir. 2009). "Interpretation of a collective bargaining agreement is a question of law, also subject to *de novo* review."  *Id.*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56.  In reviewing a summary judgment decision, this Court must view the facts and all inferences to be drawn from the facts in the light most favorable to the party against

whom summary judgment was entered. *Bell v. United States*, 355 F.3d 387, 392 (6th Cir. 2004). A genuine issue of material fact exists where there is sufficient evidence for a jury to return a verdict in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

## II.     Legal Framework

Section 301 of the LMRA provides a federal right of action for "violation[s] of contracts between an employer and a labor organization representing employees." *See* 29 U.S.C. § 185(a). In this instance, the LMRA claim also creates a derivative ERISA claim, because the disputed healthcare benefits were agreed upon pursuant to a union-negotiated contract. *Schreiber*, 580 F.3d at 363 (citing *Maurer v. Joy Techs., Inc.*, 212 F.3d 907, 914 (6th Cir. 2000)). To that end, we "assess promises to pay retirement benefits differently depending on the type of obligation involved." *Reese v. CNH Am. LLC*, 574 F.3d 315, 321 (6th Cir. 2009). Although pension benefits are considered to be a form of deferred compensation that is heavily regulated under ERISA, a promise to provide healthcare coverage does not face the same level of scrutiny. *Id.* Rather, healthcare coverage is considered a "purely contractual" "welfare benefit" that an employer typically may alter or even terminate at its will. *See id.*; *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995).

Nevertheless, an employer is free to limit its ability to alter or rescind healthcare coverage by contract. An employer that contractually obligates itself to provide vested healthcare benefits renders that promise "forever unalterable." *Sprague v. GMC*, 133 F.3d 388, 400 (6th Cir. 1998). Thus, negotiations involving vested benefits for retirees are of particular importance, in part because retired employees lack the full protection and representation of their union after they stop working. *See UAW v. Yardman, Inc.*, 716 F.2d 1476, 1484 (6th Cir. 1983) ("[E]mployers are under no obligation to bargain with unions over benefits for already retired workers . . . . [and] [s]imilarly, the union has no duty to represent retirees with the employer, although it may choose to do so."). However, because vesting is inferred solely by contract and is not required by

law, an employer's commitment to vest benefits "is not [] inferred lightly." *Sprague*, 133 F.3d at 400.

In deciding whether an employer offered vested healthcare benefits, this Court applies a different standard depending upon whether the promise was negotiated via collective bargaining. *Reese*, 574 F.3d at 321. When a healthcare plan is not the product of collective bargaining, "the intent to vest must be found in the plan documents and must be stated in clear and express language." *Id*. (quoting *Sprague*, 133 F.3d at 400). By contrast, if the healthcare plan was the product of collective bargaining, this Court instead applies "ordinary principles of contract interpretation." *Id.* (citing *Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571, 580 (6th Cir. 2006)). So long as this Court finds "explicit contractual language or extrinsic evidence" indicating an intent to vest, this Court applies the *"Yard-man* inference," which requires "a nudge in favor of vesting" in close CBA cases. *Id*. (citing *Yard-man*, 716 F.2d at 1482).

Although retiree healthcare benefits are governed by substantive federal law, we apply traditional rules of contract interpretation as long as their application is consistent with federal labor policies. *Yard-man*, 716 F.2d at 1479. In performing this analysis, we look first to the CBAs' explicit language for clear manifestations of the parties' intent. *Id*. Each provision of the CBA is interpreted as "part of an integrated whole," meaning that, "wherever possible, each provision is construed consistently with the entire document and the relative positions and purposes of the parties." *Id*. We read the documents in such a manner as to give full meaning and effect to all their text, avoiding constructions that would render provisions illusory. *Id*. at 1480.

If, however, the plain language is susceptible to more than one interpretation, we then consider extrinsic evidence to supplement the parties' intent. *Id*. at 1479–80; *UAW v. BVR Liquidating, Inc.*, 190 F.3d 768, 774 (6th Cir. 1999). "If an examination of the available extrinsic evidence fails to conclusively resolve the issue and a question of fact as to intent remains, then summary judgment is improper." *Noe v. PolyOne Corp.*, 520 F.3d 548, 552 (6th Cir. 2008).

With this legal framework in mind, we begin by analyzing the plain language of the CBAs. To the extent necessary, we turn to the extrinsic evidence to resolve any latent ambiguities left outstanding by the plain language.

### III.     Plain Language Regarding the Employees

Both the 1994 and the 1997 CBAs were drafted by Defendant, and the documents are similar in most respects.[2] The provisions addressing healthcare insurance are contained within Article XV, with Section 7 of that Article being of particular importance. Much of the parties' arguments stem from the appropriate reading of Section 7 in conjunction with Article XV's other provisions.

### A.     The 1994 CBA

Section 7(a) of the 1994 CBA provides: "Employees reaching the age of 62 during the term of this agreement shall be provided coverage under the Blue Cross/Blue Shield of Michigan Plan. These employees will pay 20% of the premium for this coverage until they reach 65. At that time, [the] company will pay 100% of premium for this coverage." Section 7(b) provides: "Effective July 1, 1997, the company will provide medical coverage through Menasha Corporation retiree medical plan for persons retiring at or after age 65. Persons retiring at age 62 will pay 20% of the premium for this coverage between ages 62 & 65."

The parties offer conflicting definitions for the terms "employees" and "persons retiring" used in Sections 7(a) and 7(b), respectively. According to Plaintiffs, the term "employees" in Section 7(a) should be interpreted to mean "retired employees." According to Defendant, the term refers only to "active employees."

Plaintiffs' primary argument relies on the overall structure of Article XV. Plaintiffs contend that Article XV is organized in a natural progression outlining the

---

[2]Under the 1997 CBA, Defendant agreed to pay 95% of the healthcare premium costs, as opposed to the 100% it agreed to pay under the 1994 CBA. In 1997, the parties also altered the policy limits for term life insurance, accidental death and dismemberment, and weekly disability benefits. The 1997 CBA changed the prescription drug co-pay plan and instituted a dental plan. None of these changes are pertinent to the present dispute.

benefits offered to the following groups: active employees (Sections 1 through 3); followed by inactive employees (Sections 4 and 5); and ending with retired employees (Sections 6 and 7). They argue that, consistent with this structure, Section 7(a) should be understood to apply as it does to its neighbors, Section 6 and Section 7(b), to retired employees. Plaintiffs contend that this interpretation is also most consistent with Article XV's earlier sections. According to their reading, Sections 1, 2, and 3(b) clearly establish healthcare benefits for all full-time, hourly employees, regardless of age. Plaintiffs suggest that reading Section 7(a) to apply only to active employees would render Sections 1 through 3 redundant.

Plaintiffs also contend that Defendant's reading would put Article XV's sections in conflict and would introduce age discrimination between the company's younger and older employees. Plaintiffs point out that conferring fewer employment benefits to active employees between ages 62 and 65 would defy the CBA's own internal policy against age discrimination, *see* Article II, Section 2, as well as the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq*. In order to avoid these anomalies, Plaintiffs reason that Section 7(a) must apply only to retired employees, regardless of the fact that the plain text makes no such distinction.

Defendant also harnesses Section 7(a)'s placement, but to the opposite interpretation. Defendant points to the proximity of the terms "employees retiring" in Section 6 and "persons retiring" in Section 7(b) as evidence that the drafters knew precisely what language to use in conferring retirement benefits, and that by failing to do so, the drafters deliberately chose not to extend healthcare benefits to retired employees. Citing *Allied Chem & Alkali Workers v. Pittsburgh Plate Glass Co.*, Defendant argues that Plaintiffs' interpretation defies the "ordinary meaning of 'employee'" which typically "does not include retired workers" because "retired employees have ceased to work for another for hire." 404 U.S. 157, 168 (1971). Finally, Defendant suggests that Plaintiffs' reading would render Section 7(b) superfluous, because Section 7(b) expressly applies only to "persons retiring."

The district court concluded that both interpretations advanced by the parties had their "weaknesses," although both were also "plausible." *Moore II*, 724 F. Supp. 2d at 804. We agree. The distinction between the terms used in Sections 7(a) and 7(b) would be more significant if the CBA expressly defined the terms "employee" and "persons retiring" and used those phrases consistently. As it stands, however, "persons retiring" is an undefined term that is not used elsewhere in the contract. And while the CBA defines "employee," its definition provides little direction for the issue at hand:

> Employees: All employees of the Company excluding office clerical employees, Company executives, supervisors, truck drivers, watchmen, technicians, or those engaged in confidential capacities.

(Art. I, Section 2(a)).

Defendant argues that Plaintiffs' attempt to read "retired employees" into this definition interjects new language into Section 7(a). However, because the contract's definition of "employee" makes no plain distinction between active and retired employees, reading the definition to mean "active employees" would equally add non-existent language into the contract. *See Noe*, 520 F.3d at 562.

Moreover, neither party's structural argument is dispositive. While we agree that Article XV evinces a natural progression from active employees to retired employees, Section 7(a)'s use of the bare term "employee" in such close proximity to language clearly applying only to retirees renders Section 7(a)'s inconsistent drafting ambiguous, at the very least.

Neither party has put forth an interpretation which would adequately square Article XV as a whole. Defendant's interpretation creates inconsistencies with the coverage clearly afforded active employees in Sections 1, 2, and 3(b). Likewise, Plaintiffs' interpretation is unsatisfactory because it fails to resolve the inconsistent drafting between Sections 7(a) and 7(b) and does not explain why employees retiring within the 1994 to 1997 time period would be treated differently than those retiring after 1997. Under Plaintiffs' interpretation, the only distinction between Sections 7(a) and

7(b) is the different source of the benefits. However, the CBA only briefly mentions the BCBS plan, and it is entirely silent as to the parameters of the "Menasha Corporation Retiree Medical Plan." Without an explanation regarding these discrepancies within the four corners of the document, it is difficult to determine what, if any, practical significance to take from this shifted language.

Because neither interpretation of the contractual terms is plain, Section 7(a) is ambiguous. In order to determine whether the parties intended to provide healthcare benefits for employees who retired during the term of the 1994 CBA, this Court must refer to the extrinsic evidence.

### B.      The 1997 CBA

Unlike the 1994 CBA, the 1997 CBA unambiguously shows an intent to vest healthcare benefits in retirees. The 1997 CBA eliminated Section 7(a) and essentially adopted a revised version of the 1994 CBA's Section 7(b). Section 7 of the 1997 CBA therefore provides: "Effective July 1, 1997, the Company will provide medical coverage through the Menasha Corporation Retiree Medical Plan for persons retiring at or after age 65. Persons retiring at age 62 will pay 20% of the premium for this coverage between the ages of 62 & 65."

By deleting Section 7(a), the 1997 CBA eliminated the contractual ambiguity between Sections 7(a) and 7(b) of the 1994 CBA. Accordingly, the 1997 CBA plainly entitled Victor Adams, the only plaintiff retiring under that CBA, to retiree healthcare benefits. Defendant contends that it is not obligated to pay 100% of the premium for Adams's life, since the 1997 CBA does not promise a particular duration or amount of premium contribution. *See Reese*, 574 F.3d at 324 (parties' actions showed an understanding that "healthcare benefits are not akin to black-and-white pension benefits that cannot be diminished by one cent once they have vested"). But elsewhere in the document, the parties expressly limited the duration and percentage of contribution. For example, in Article XV Section 2, Defendant agreed to pay 95% of the medical premiums for employees, and the employees would pay the remaining 5%. And in

Section 4, Defendant agreed to pay life insurance premiums for an additional six months after an employee was laid off.

The district court held that the lack of limitations in Section 7 reasonably meant that there are no such limitations, not that Defendant could provide coverage in the amount and for the duration as determined by its sole discretion. *See Noe*, 520 F.3d at 562–63 ("The presence of specific durational language in other provisions and its absence in the retiree healthcare benefits provisions suggests an intent to vest."). We agree.

## IV.     Plain Language Regarding the Spouses

### A.     The 1994 CBA

According to Defendant, Plaintiffs' claims for spousal benefits are even more tenuous. Defendant's primary argument is that Sections 7(a) and 7(b) never mention dependent or spousal coverage, but instead extend benefits only to "employees" and "persons retiring." Defendant concludes that reading spousal coverage into these provisions would require the improper addition of terms into otherwise plain, unambiguous language.

Plaintiffs turn again to the structure of Article XV. They argue that, regardless of Section 7's silence as to spousal coverage, it may be inferentially extended by reading Section 7(a) in conjunction with Section 3(b). Section 3(b), titled "Employee and Dependent Coverage," provides the healthcare benefit plan offered through BCBS. The only other place where the BCBS plan is mentioned is in Section 7(a). Plaintiffs argue that the interplay between Sections 3(b) and 7(a) at least creates sufficient ambiguity to warrant consideration of extrinsic evidence about spousal coverage.

The district court sided with Defendant, reasoning that Plaintiffs' argument was "inconsistent" with its argument that "Sections 1, 2, and 3(b) apply to active employees, whereas Section 7(a) applies to retiring employees." *Moore III*, 2010 WL 3210760, at *1. Because the district court found that Section 7(a) unambiguously does not mention spouses and that finding otherwise would conflict with Plaintiffs' structural argument,

the court refused to consider any extrinsic evidence on the matter.  On this point, we disagree with the district court's analysis.

The district court's conclusion relies on an interpretation viewing the spouse as a *beneficiary* of coverage, instead of viewing spousal coverage as a *benefit* itself.  However, if spousal coverage is a benefit only, Plaintiffs' structural argument would not necessarily be inconsistent with a claim extending spousal benefits to retirees.

The language at issue in this case notably differs from that used in other contracts this Court has examined.  In this Circuit's prior cases, we have examined contracts that explicitly conferred benefits to individuals who—like the spouses here —would not themselves be parties to the collective bargaining agreement.  To take but one example, in *Reese*, the contract stated as follows: "Employees who retire under the [CBA] *or their surviving spouses* [are] eligible to receive [healthcare benefits]." *Reese*, 574 F.3d at 322; *see also Noe*, 520 F.3d at 560;  *Yolton*, 435 F.3d at 583; *Yard-man*, 716 F.2d at 1480.

By contrast, the contracts in the instant case never directly confer coverage to spouses or dependents.  Rather, the benefits-conferring language—throughout Article XV, and elsewhere in the CBA— refers only to "employees."  Instead of extending benefits to "employees and their spouses" or to "employees and their dependents," the CBAs only provide dependent coverage through the sole named beneficiary of the contract—that is, the employees themselves.

 The sections dealing with healthcare benefit coverage for active employees are instructive.  Article XV, Section 1 provides that "the Company shall provide a Group Insurance Plan for all full-time hourly employees . . ."  Then, in Section 3, titled "Employee & Dependent Coverage," the contract enumerates the coverage provided in the BCBS Group Insurance Plan.  Section 3 does not, however by its own force, confer benefits to dependents.  Rather, that coverage can only be inferred by reading Section 3 in conjunction with Section 1 as providing derivative benefits for dependents.  And no one appears to dispute that active employees received spousal and dependent healthcare coverage as a benefit of their employment.

Accordingly, because the only beneficiaries to the CBAs are the employees described in Section 1, the spousal and dependent coverage offered in Section 3 can be appropriately understood to be a *benefit* provided to those employees. Therefore, the dependents themselves are not *beneficiaries* to the contract. This distinction differentiates these CBAs from the contracts detailed above, and at the very least, renders the poorly drafted language ambiguous. Moreover, the fact that the benefit described—the BCBS Plan—is only mentioned in one other place, under the heading "Employee & Dependent Coverage," may in fact represent an inelegant attempt to confer a dependent coverage benefit on retired employees.

Contrary to the district court's suggestion, this alternative interpretation does not offend the overall structure of Article XV. If spousal coverage was solely a benefit conferred on the retired employees, the structural delineation of Article XV's sections (by active, inactive, and retired employees) remains fully intact. Moreover, this progression does not force parity upon the benefits conferred to each group. In other words, this reading gives full effect to the contract by preserving the structural delineation by beneficiary while also recognizing that certain beneficiaries may be entitled to the same—or to different— benefits as other beneficiaries.

However, even under this interpretation, Plaintiffs cannot overcome the equally available interpretation— that reference to the BCBS plan and the omission of dependent coverage—indicates that retiree healthcare benefits were offered solely to the retired employees under Section 7(a). Because this entirely viable interpretation renders Section 7(a) ambiguous, we conclude that reference to extrinsic evidence on spousal coverage is equally necessary under the 1994 CBA.

**B.    The 1997 CBA**

Virtually the same analysis holds true for spousal benefits under the 1997 CBA. Section 7 of the 1997 CBA uses the term "persons retiring," which is undefined by the contract. This language could be interpreted equally to embrace the Defendant's interpretation (employees only) or the Plaintiffs' (employees in addition to their spouses). Moreover, as discussed above, the contractual structure indicates that the

employees may in fact be the only beneficiaries to the CBAs.  Because the contract does not define the "Menasha Corporate Retiree Medical Plan" mentioned in Section 7, there is no means to determine by the plain language whether that Plan was intended to include spousal coverage.

Because the 1997 CBAs are ambiguous as to both retiree and spousal coverage, it is necessary to resort to the extrinsic evidence on these issues as well.

## V.     The Extrinsic Evidence

As the district court correctly noted, the extrinsic evidence "overwhelming indicates" that the parties intended to extend vested healthcare insurance coverage under the CBAs to both retired employees and their spouses. *Moore II*, 724 F. Supp. 2d at 804. The following briefly summarizes that evidence.

### A.     Summary Plan Descriptions

In 1996, Defendant issued a summary plan description ("SPD") of the Menasha Coloma employees' benefit package, which provided a plain language explanation of benefits to plan participants as required by ERISA and Department of Labor regulations. Although SPDs are not considered to be "legally binding," nor are they "parts" of the benefit plan themselves, *see Cigna Corp. v. Amara*, 131 S.Ct. 1866, 1877–88 (2011), they may be used as extrinsic evidence to resolve ambiguities latent in the contractual language. *Schreiber*, 580 F.3d at 364–65.

The 1996 SPD stated:

> If you retir[e] on or after June 17, 1994 and before July 1, 1997 you are eligible for the Blue Cross/Blue Shield Group Medical Plan as a retired employee if you retire from Menasha Corporation provided that on the date your employment ceased you are between the ages of 62 and 65 and you are immediately eligible to receive a benefit from the Menasha Corporation Retirement Income Plan . . . .
>
> Menasha Corporation shall contribute 80% of the premium when the employee is between the ages of 62 and 65.  The retired employee will pay 20%.  When the retired employee attains age 65, Menasha Corporation will contribute 100% of the premium.  Menasha Corporation

shall contribute 80% on behalf of a dependent spouse, the retired employee will pay 20%. When the dependent spouse attains age 65, Menasha Corporation shall contribute 100% of the premium.

Effective July 1, 1997 the terms of the retiree group medical plan will not change except that the plan offered to persons retiring at or after age 62 will be the Menasha Retiree Group Medical Plan.

In addition to this language, the 1996 SPD referred to spousal coverage in several other places. Under the heading "Dependents" the SPD advised, "You may cover your spouse and unmarried children who are under 19 years of age." The SPD also stated that "coverage for your dependents will take effect on the date your coverage takes effect if you have elected dependant coverage." The SPD generally confirmed healthcare insurance for "each retiree and dependent spouse" and their "other dependents."

In 2003, Defendant issued another SPD which confirmed that "[a] retiree medical plan was agreed to by Menasha Corporation" for "Coloma union hourly employees . . . who were at least 62 at the time of retirement and who retired on and after January 1, 1985, but prior to July 1, 1997." The 2003 SPD also mentioned coverage for "dependents" and "spouses" and stated that "no person may be covered as a dependent of more than one retiree."

**B.       Oral Statements by Menasha Human Resources Representatives**

Plaintiffs Eleanor Rhodes and Victor Adams also submitted affidavits stating that, just prior to retiring, they met with Menasha human resource representatives to discuss their retirement healthcare benefits. Rhodes stated that the representatives told her that she would receive lifetime healthcare consistent with the apportionments outlined in Section 7(a) of the 1994 CBA. Adams stated that human resources told him that he and his wife would receive lifetime healthcare consistent with Section 7 of the 1997 CBA. Defendant has offered no evidence to dispute these affidavits.

**C.       Letters Updating Retirees on their Healthcare Coverage**

Plaintiffs Eleanor Rhodes and Robert Moore also submitted letters they received from Defendant dated October 20, 2005. The stated purpose of the letters was to

"update" their recipients about the details of their "retiree medical benefit program[s]." Rhodes' letter lists a monthly premium for her 2006 Menasha Corporation Retiree Medical Plan.[3]  Moore's letter is similar, but lists a monthly premium for both Robert as the "Retiree" and a second monthly premium for Marjorie Moore under the heading "Spouse."

### D.     BCBS Insurance Documents

Plaintiffs also point to several of the BCBS insurance documents, arguing that it is appropriate to reference these documents because of the CBAs provision that "[t]he insurance contract is a separate document and shall contain all provisions concerning the Insurance Plan."  (*See* Article XV, Section 3.)

First, Plaintiffs cite the 1994 Group Enrollment and Coverage Agreement entered into by BCBS and Menasha, which states: "newly acquired dependents must be added within 30 days of the event, e.g.[,] spouse by marriage, newborn."  Second, Plaintiffs cite to a 1998 Addendum to the Group Enrollment and Coverage Agreement, which states that "subscriber contracts enrolled under [the Addendum] are limited to qualified retirees and survivors eligible under the Group's Retirement Program."  Third, Plaintiffs point to the " Request for Retiree Segment," which is part of the 1998 Group Enrollment and Coverage Agreement.  That provision indicates that a "surviving spouse option [is] available."[4]

### E.     Defendant's Pattern of Conduct

Finally, Plaintiffs ask this Court to consider the fact that Defendant actually paid out the healthcare premiums for the employees and their spouses without interruption from 1994 through 2006 in accordance with the appropriations described in Section 7 of the CBAs.

---

[3]Rhodes did not file for spousal benefits.

[4]Plaintiffs also cite to agreements entered into between BCBS and Menasha in March 1998 and April 1998 which refer to "qualified retirees and survivors," a "surviving spouse option," and "the retiree and/or surviving spouse."  We disregard these agreements because they postdate the retirements of the employees.

### F.     Extrinsic Evidence to the Contrary

Defendant provides little to combat the weight of the extrinsic evidence detailed above.  Instead, Defendant argues that while it was not legally obligated to provide its union retirees or their spouses with healthcare benefits, it did so solely as an expression of "goodwill."  Defendant asserts that this lawsuit is nothing more than proof that "no good deed goes unpunished."

We agree with the district court that "[t]hough it is possible that Defendant's payments resulted solely from goodwill," the admissions contained in the SPDs, the representations made by Menasha's human resources representatives, the letters to various Plaintiffs confirming their benefits, and the general economics of the matter, "strongly suggest that the payments resulted from a sense of obligation."  *Moore II*, 724 F. Supp. 2d at 805.  Because the extrinsic evidence overwhelmingly indicates that the parties negotiated for healthcare insurance benefits for the retired employees and their spouses, we find in the Plaintiffs' favor under both CBAs.

## VI.     Whether the Employee and Spousal Coverage Vested

Defendant's next attempt to evade liability argues that, even if the company extended healthcare benefits to its retired employees and their spouses, that promise was not for vested coverage.  As mentioned above, healthcare benefits are typically considered only to be a "welfare benefit," freely terminable or alterable by the employer at will.  *Curtiss-Wright Corp.*, 514 U.S. at 78.  However, if an employer chooses to vest benefits, it renders those benefits "forever unalterable." *Sprague*, 133 F.3d at 400. Particularly in the context of collective bargaining agreements, the intent to vest is a significant bargained-for-term because retirees lose much of their bargaining power upon retirement.  In deference to that fact, this Court infers vesting only where explicit contractual language or extrinsic evidence indicates an intent to vest.  *Reese*, 574 F.3d at 321.  In close cases, however, we apply a thumb on the scale in favor of vesting. *Yard-man*, 716 F.2d at 1482.

Here, application of the *Yard-Man* inference is appropriate. The Sixth Circuit has consistently held that the inclusion of specific durational limitations in some provisions, but not others, suggests that benefits "not so specifically limited, were intended to survive." *See Yolton*, 435 F.3d at 581–82 (citing *Yard-Man*, 716 F.2d at 1481–82); *see also Reese*, 574 F.3d at 323. In Sections 2, 3, 4, and 5 of Article XV, the CBAs specify durational limitations. Section 7, by contrast, contains no such restriction. Applying the standard principles of contract interpretation and the *Yard-Man* inference, the plain language and the extrinsic evidence indicates that the parties bargained for vested healthcare insurance benefits for the retired employees and their spouses. *See Bender v. Newell Window Furnishings, Inc.*, 681 F.3d 253, 264 (6th Cir. 2012) (citing cases).

## A.     Reservation of Rights Clause

Defendant argues in the alternative that, despite the clear intent to vest, the company retained the right to unilaterally terminate Plaintiffs' retirement healthcare benefits at will. In support, Defendant points to a "reservation of rights clause" ("ROR") included in the 1996 and 2003 SPDs. The ROR states,

> The Company reserves the right to terminate the Plan at any time and for any reason. If the Plan is amended or terminated you and other active and retired employees may not receive benefits as described in other sections of this [SPD]. You may be entitled to receive different benefits under different conditions. However, it is possible that you will lose all benefit coverage. This may happen at any time, even after you retire, if the Company decides to terminate the Plan or your coverage under the Plan. In no event will you become entitled to any vested rights under this Plan.

This Circuit has held that an SPD reservation of rights clause may reserve an employer's right to unilaterally alter or terminate benefits coverage—even if the SPD was distributed after the CBA. *See Reese*, 574 F. 3d at 323 (citing *Prater v. Ohio Educ. Ass'n*, 505 F.3d 437, 444 (6th Cir. 2007)). However, a ROR clause must be interpreted as is any other extrinsic evidence; namely, the ROR cannot internally contradict other provisions of the SPD, nor can it contradict the terms of the CBA itself. If the SPD

otherwise indicates that it is "subject to the provisions of the CBA," the SPD is deemed "unqualified" and cannot trump the parties' collectively bargained agreement. *See Prater*, 505 F.3d at 444–45. Likewise, if the CBA states that it is the fully integrated commitment of the parties or that it cannot be amended without signed mutual consent, the ROR will not trump the CBA. *Id.* Only where the SPD states "an unqualified assertion of a unilateral right to end retiree medical insurance benefits without regard for existing or future CBAs," do we allow a later-issued SPD to trump the terms of a bargained-for CBA. *Bender*, 681 F.3d at 266. The ROR here does not meet this high standard.

The district court correctly rejected Defendant's argument, because the second limitation regarding unilateral modification applies.[5] In Article XXVI, Section 4, the CBAs provide that, "[t]his Agreement may be amended at any time by mutual agreement of the parties hereto." Because the parties agreed on the procedure to be used in amending their agreement, it would read that provision out of the contract to allow Defendant to unilaterally modify the terms by an alternate avenue. Moreover, allowing the reservations of rights clause to trump the bargained-for procedure would vitiate a negotiated benefit of the contract. *Prater*, 505 F.3d at 444. The fact that the parties did not use a "zipper clause" indicating that the CBA was the fully integrated agreement of the parties does not undermine our conclusion. *See Bender*, 681 F.3d at 265–66.

## B.     Welfare Benefits

Finally, Defendant generally presses the fact that healthcare is considered a "welfare benefit" that is not entitled to the same level of protection under ERISA as are pension benefits. Regardless, employers are free to waive their power to alter or terminate welfare benefits, and Defendant clearly did so here. By offering vested healthcare coverage to the retired employees and their spouses, and by agreeing that the

---

[5]The first limitation does not apply. Although the SPD states, "[i]f the terms of the Summary Plan Descriptions and the Certificate of Coverage differ from the plan and policy, the plan and policy will govern," this statement only qualifies the "Basic Life Insurance and Basic Accidental Death & Dismemberment Insurance" section. The statement does not qualify the SPD's following section relating to "Medical Benefits."

CBAs could only be modified on the signed, mutual consent of the parties, Defendant waived its ability to unilaterally alter or terminate Plaintiffs' healthcare coverage. Our finding does not wholly foreclose Defendant from adjusting coverage; rather, it simply underscores the procedure Defendant must follow in order to do so.

## CONCLUSION

For the reasons stated above, we **REVERSE** the district court's judgment and **REMAND** for entry of judgment in favor of Plaintiffs in accordance with this opinion.