**THOMAS M. COOLEY LAW SCHOOL, Plaintiff,**

**v.**

**KURZON STRAUSS, LLP, et al., Defendants.**

**Case No. 1:11–CV–844.**

United States District Court, W.D. Michigan, Southern Division.

Sept. 30, 2013.

Brad H. Sysol, Michael P. Coakley, Paul D. Hudson, Miller Canfield Paddock & Stone PLC, Detroit, MI, Cherie Lee Beck, James B. Thelen, Thomas M. Cooley Law School, Lansing, MI, for Plaintiff.

Jesse Strauss, Strauss Law P.L.L.C., New York, NY, Steven Mark Hyder, Hyder Law Firm PC, Monroe, MI, David Anziska, Law Offices of David Anziska, New York, NY, for Defendants.

## OPINION AND ORDER

ROBERT J. JONKER, District Judge.

This matter is before the Court on a series of motions for summary judgment Defendants have filed (docket ## 184, 186, 200, 237). These motions articulate a range of theories, but all center on the fundamental dispute in this case: Plaintiff Thomas M. Cooley Law School's ("Cooley") claim that Defendants made false statements that hurt Cooley. The Court has heard oral argument on the motions, thoroughly reviewed the record, and carefully considered the applicable law. The motions are ready for decision.

## Factual and Procedural Background

Cooley is a non-profit corporation organized under Michigan law with its principal place of business in Lansing, Michigan. (Compl., docket # 1–1, at ¶ 2.) Cooley describes itself as "the largest American Bar Association accredited law school in the United States by total enrollment, with campuses in Lansing, Ann Arbor, Auburn Hills, and Grand Rapids, Michigan.[1] (Id.) At the time the Complaint was filed, Defendant Kurzon Strauss LLP ("Kurzon–Strauss") was a law firm organized as a New York limited liability partnership.[2] Defendant Jesse Strauss is a citizen of New York and an attorney licensed to practice in New York. (Id. at ¶ 5; Strauss aff., docket # 238, at ¶ 2.) In 2011, he was one of two members of Kurzon–Strauss.[3] (Strauss aff., docket # 238, at ¶ 4.) Defendant David Anziska is a citizen of New York and an attorney. (Compl., docket # 1–1, at ¶ 4.) Between May 1, 2011 and September 30, 2011, Mr. Anziska "served as of counsel" to Kurzon–Strauss. (Anziska aff., docket # 202, at ¶ 3.)

In early May 2011, Mr. Anziska "began to explore the possibility of suing law schools for inflating their post-graduate employment data." (Id.) He became interested in the issue after reading a New York Times article entitled "Is Law School

---

1. Indeed, since the time this case was filed, Cooley has continued to expand, adding a campus in Tampa Bay, Florida in May 2012. *Fifth Term Starts at Tampa Bay Campus with New Faculty*, http://www.cooley.edu/news/2013/fifth_term_starts_at_tampa_bay_campus_with_new_faculty.html (last visited September 19, 2013).

2. In October 2012, Kurzon Strauss LLP changed its name to Kurzon LLP after Defendant Jesse Strauss left the firm to pursue a solo law practice. (Kurzon aff., docket # 185–6, ¶ 2.)

3. The other member of Kurzon Strauss LLP, Jeff M. Kurzon, is not named as a defendant in this lawsuit.

a Losing Game?" profiling several recent law school graduates who had been unable to secure work in the field of law. (*Id.* at ¶ 4. and Ex. 2.) [4] The article includes quotations from law professors:

> Enron-type accounting standards have become the norm," says William Henderson of Indiana University, one of many exasperated law professors who are asking the American Bar Association to overhaul the way law schools assess themselves.... It is an open secret, Professor Henderson and others say, that schools finesse survey information in dozens of ways[.]
>
> ....
>
> "I think the student loans the kids leave law school with are more scandalous than payday loans, says Andrew Morriss, a law professor at the University of Alabama. "And because it's so easy to get a student loan, law school tuition has grossly outpaced the rate of inflation for the last 20 years. It's now astonishingly high."

(*Id.*) Mr. Anziska also read an article by Paul Campos, a law professor from the University of Colorado Law School, entitled "Served: How Law Schools Completely Misrepresent Their Job Numbers." [5] (*Id.* at ¶ 5 and Ex. 3.) The article posits that "[l]aw schools ... make it much harder than it needs to be [for potential law students to decide whether to invest in a legal education] by publishing misleading data about their employment statistics." (*Id.* at Ex. 3.) In early May 2011, Mr. Anziska contacted Mr. Campos and discussed the article with him. (*Id.* at

¶ 6 and Ex. 4.) He also told Mr. Campos that "we are definitely interested in retaining you as a litigation consultant." (*Id.*) The same month, Mr. Anziska reviewed blogs and websites that discussed the employment situation for recent law school graduates. (*Id.* at ¶ 7.) He communicated with three or more blog authors, including Cryn Johannsen, author of the blog "All Education Matters." (*Id.* at ¶ 8.) He read other articles, papers, and reports concerning the ways law schools report employment data. (*Id.* at ¶ 9) These materials included, among others: Jason M. Dolin, "Deciphering Law Schools' Post–Graduate Employment Data;" (published in The Ohio Lawyer); Kyle McEntree & Patrick Lynch, "A Way Forward: Improving Transparency in Employment Reporting at American Law Schools (http://papers.ssrn.com/so13/papers.cfm?abstract_id=1528862); Joel Murray, "Professional Dishonesty: Do U.S. Law Schools that Report False or Misleading Employment Statistics Violate Consumer Protection Laws" (June 7, 2011); "Selected Findings for the Class of 2010" published by the National Association for Legal Career Professionals ("NALP"). (*Id.*) Mr. Anziska also reviewed a website called JD Underground, at jdunderground.com, and another entitled The Thomas Cooley Law Scam Blog, at thomas-cooley-law-school-scam.weebly.com. (*Id.* at ¶ 13.) At both of these websites, he viewed "unflattering posts" about Cooley. (*Id.*) On the All Education Matters website, Mr. Anziska viewed a report that the Department of

---

**4.** The issue has remained in the news. *See, e.g.,* "Law Schools' Applications Fall as Costs Rise and Jobs are Cut," *New York Times,* January 31, 2013 ("In recent years there has also been publicity about the debt load and declining job prospects for law graduates ... [l]ast spring, the American Bar Association released a study showing that within nine months of graduation in 2011, only 55 percent of those who finished law school found full time jobs that required passage of the bar exam.").

**5.** The article appeared in an online edition of *The New Republic,* http://www.tnr.com, on April 25, 2011. (Anziska aff. at Ex. 3.)

Education "was investigating Cooley for failing to adequately disclose its graduates' true default rates." (*Id.*) On the same website, he viewed a post reporting that "recent Cooley graduates were defaulting [on student loan repayments] at a 41 percent rate." (*Id.*)

It is undisputed that on June 8, 2011, Mr. Anziska posted the following statement on the website "JD Underground," hosted at http://www.qfora.com/jdu:

> My firm is currently conducting a broad, wide-ranging investigation of a number of law schools for blatantly manipulating their post-graduate employment data and salary information. These schools are preying on the blithe ignorance of naive, clueless 22–year–olds who have absolutely no idea what a terrible investment obtaining a JD degree is. Perhaps one of the worst offenders is the Thomas Cooley School of Law, which grossly inflates its post-graduate employment data and salary information. More ominously, there are reports that there [sic] students are defaulting on loans at an astounding 41 percent, and that the school is currently being investigated by the DOE for failing to adequately disclose its students' true default rates. Unfortunately, the ABA has proven to be absolutely toothless in regulating these schools and stamping out these dubious practices, and most likely schools like Thomas Cooley will continue to defraud unwitting students unless held civilly accountable. If you have any relevant information or know of anyone who has attended Thomas Cooley feel free to contact me at anziska@kurzonstrauss.com. Obviously, all correspondences will be kept strictly confidential.

(Compl., docket # 1–1, at ¶ 8; Anziska aff., docket # 202, at ¶ 15.)

On June 13, 2011, counsel for Cooley contacted Mr. Anziska via telephone and written correspondence. (Compl., docket # 1–1, at ¶ 12 and Ex. B.) Cooley's counsel summarized the telephone conference in a cease and desist letter:

> As Dean Thelen advised you on the telephone, several statements in your posting are, quite simply, false, reckless, defamatory, and actionable. Specifically, without limitation the following statements are factually wrong and per se actionable:
>
> • ... [O]ne of the worst offenders is the Thomas Cooley School of Law, which grossly inflates its post-graduate employment data and salary information.
>
> • ... [T]here are reports that there [sic] students are defaulting on loans at an astounding 41 percent, and that the school is being investigated by the DOE for failing to adequately disclose its students' true default rates
>
> • .... schools like Thomas Cooley will continue to defraud unwitting students unless held civilly accountable.
>
> On behalf of Thomas M. Cooley Law School, we demand that you immediately remove this entire posting from the Internet, pursuant to MCL 600.2911 issue a retraction, and cease and desist from posting or communicating any defamatory statements regarding Thomas M. Cooley Law School.

(*Id.*)

Mr. Strauss responded to the cease and desist letter. (*Id.* at Ex. C.) He noted that the "comments you allege to be 'defamatory' are based on information garnered during this firm's investigation and we do not believe them to be defamatory. In fact, we have every reason to believe those comments to be true." (*Id.*) He added that "for the sake of avoiding protracted and

superfluous litigation and clearing any potential or otherwise imagined misunderstanding," Kurzon–Strauss would post the following statement:

It has been brought to this firm's attention that a post on this site on June 8, 2011 entitled, "Investigating the Thomas Cooley School of Law" contained certain allegations which may have been couched as fact regarding employment and default data. These statements are hereby retracted. Moreover, representatives of Thomas Cooley Law School have informed us that published reports regarding Thomas Cooley Law School's student loan default rate and of an investigation by the Federal Department of Education are incorrect. Therefore, we retract those statements as well.

(*Id.*) It is undisputed that Defendants posted this statement on the JD Underground website on June 15, 2011.

It is also undisputed that after posting the retraction on the JD Underground website, on approximately June 17, 2011, Mr. Anziska posted a proposed draft class action complaint (the "Draft Complaint") against Cooley on a publicly available Internet site and encouraged others to disseminate the proposed class action complaint to potentially interested persons. The Draft Complaint bears the label "DRAFT COMPLAINT[;] ATTORNEY WORK PRODUCT—PRIVILEGED & CONFIDENTIAL" at the top and bottom of each page of the Draft Complaint. (docket # 186, Ex. B and E.) The Draft Complaint alleges, among other things, that Cooley "blatantly misrepresent[s] and

manipulat[e]s its employment statistics to prospective students, employing the type of 'Enron-style' accounting techniques that would leave most for-profit companies facing the long barrel of a government indictment and the prospect of paying a substantial criminal fine[;]" and that Cooley "grossly inflates its graduates' reported mean salaries[.]" (*Id.*) There is no dispute that between June 21, 2011 and July 13, 2011, Mr. Anziska posted the following statement on the JD Underground website, as well as the Craigslist New York and Craigslist Detroit Metro Area websites:

My firm is currently conducting a broad, wide-ranging investigation of a number of law schools for purportedly manipulating their post-graduate employment data and salary information. Among the many schools we are investigating is the Thomas M. Cooley Law School which claims that 76 percent of its graduates have allegedly secured employment within nine months of graduation. If you have any relevant information or know of anyone who has attended Thomas Cooley feel free to contact me at anziska@kurzonstrauss.com. Obviously, all correspondences will be strictly confidential. Thanks in advance.

(*Id.* at Ex. B and F; Anziska aff. at Ex. 26.)

On July 14, 2011, Cooley filed this lawsuit in Ingham County Circuit Court. (docket # 1–1). Defendants removed the case to this Court on August 11, 2011, on the basis of diversity jurisdiction. (docket # 1.)⁶ Cooley brings claims of defamation;

---

**6.** A day before removing this case, on August 10, 2011, Defendants filed a putative class action lawsuit against Cooley, *MacDonald v. Thomas M. Cooley Law School*, No. 1:11–CV–831, in the Western District of Michigan. The *MacDonald* plaintiffs alleged "that Cooley deceived, defrauded, and misled them regarding

Cooley graduates' employment prospects, which caused Plaintiffs to pay more to attend law school than they would have paid if Plaintiffs had known the true prospects of their employment." *MacDonald v. Thomas M. Cooley Law School*, 880 F.Supp.2d 785, 788 (W.D.Mich.2012). The *MacDonald* plaintiffs

tortious interference with business relations; breach of contract; and false light against Defendants. (*Id.* at 1–1.) Defendants now move for summary judgment on all claims.

## Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Schreiber v. Philips Display Components Co.,* 580 F.3d 355, 363 (6th Cir.2009) (quoting FED. R. CIV. P. 56). The moving party must "inform the district court of the basis for its motion," and it must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (internal quotation marks omitted). "In considering a motion for summary judgment, the district court must construe all reasonable inferences in favor of the non-moving party." *Id.* (quotation omitted).

### 1. Defamation Claim

#### A. Legal Standards

■■■ To maintain a defamation action under Michigan law, a plaintiff must establish each of the following elements:

(a) a false and defamatory statement concerning plaintiff; (b) an unprivileged publication to a third party; (c) fault amounting to at least negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by the publication (defamation per quod).

*Andrews v. Prudential Securities,* 160 F.3d 304, 308 (6th Cir.1998) (internal quotation marks omitted). " 'A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.' " *Rouch v. Enquirer & News of Battle Creek Michigan,* 440 Mich. 238, 251, 487 N.W.2d 205, 211 (1992) (quoting 3 Rest. Torts, 2d, § 559, p. 156). Under the First and Fourteenth Amendments, a public figure plaintiff may recover on a defamation claim only if there is proof that a defendant "published a damaging falsehood 'with "actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.' " *Herbert v. Lando,* 441 U.S. 153, 156, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) (quoting *New York Times v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

■■■ Public figures include those who achieve fame "by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). A plaintiff may be a limited-purpose public figure or a general-purpose public figure. "In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Id.* at 351, 94 S.Ct. 2997. A "public controver-

charged Cooley with violating Michigan's Consumer Protection Act; fraud; and negligent misrepresentation. *Id.* The *MacDonald* court granted Cooley's motion to dismiss un- der FED. R. CIV. P. 12(b)(6). *Id.* The Sixth Circuit affirmed this decision. *MacDonald v. Thomas M. Cooley Law School,* 724 F.3d 654 (6th Cir.2013).

sy" is "a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Waldbaum v. Fairchild Pub., Inc.*, 627 F.2d 1287, 1296 (D.C.Cir.1980). It is "a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." *Id.* In cases involving a public controversy, the Sixth Circuit has considered the following factors in determining whether a defendant is a public figure: "[t]he extent to which participation in the controversy is voluntary, the extent to which there is access to channels of effective communication in order to counteract false statements, and the prominence of the role played in the public controversy." *Wilson v. Scripps–Howard Broadcasting Co.*, 642 F.2d 371, 374 (6th Cir.1981).

■■■■ "Actual malice" is defined as "knowledge that [a statement] was false or with reckless disregard of whether it was false or not." *Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710 (1964). For public figures, a showing of actual malice is subject to a clear and convincing standard of proof. *Gertz*, 418 U.S. at 342, 94 S.Ct. 2997. Whether a record may support a finding of actual malice is a question of law. *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 667, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). Actual malice "requires at a minimum that the statements were made with a reckless disregard for the truth." *Id.* Reckless disregard requires that "the defendant must have made the false publication with a high degree of awareness of probable falsity or must have entertained serious doubts as to the truth of his publication." *Id.* (internal quotations omitted). The inquiry "is a subjective one—there must be sufficient evidence to permit the conclusion that the defendant actually had a high degree of awareness of [ ] probable

falsity." *Id.* at 688 (internal quotation omitted). Consequently, "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard." *Id.* In a case involving the reporting of a third party's allegations, "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Id.*

■■■■ Truth is an absolute defense to a defamation claim. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 770, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). Under Michigan law, "[i]f the gist, the sting, of the [statement] is substantially true, the defendant is not liable." *Fisher v. Detroit Free Press*, 158 Mich.App. 409, 414, 404 N.W.2d 765, 767 (1987). Statements "that cannot reasonably be interpreted as stating actual facts about an individual" are also protected from defamation claims. *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 597 (6th Cir.2013) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990)). In *Milkovich*, the Supreme Court "reaffirmed its prior decisions that protect statements employing 'loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously maintaining' an assertion of fact." *Id.* (quoting *Milkovich*, 497 U.S. at 20–21, 110 S.Ct. 2695).

### B. Discussion

Cooley asserts that the following statements made before Defendants published a retraction were defamatory:

Cooley "grossly inflates its post-graduate employment and salary information[;]

"[T]here are reports that there [sic] students are defaulting on loans at an astounding 41 percent rate, and that the

school is currently being investigated by the DOE for failing to adequately disclose its students' true default rates[;]"

"[M]ost likely schools like Thomas Cooley will continue to defraud unwitting students unless held civilly accountable."

Cooley asserts further that the following statements made in the Draft Complaint were defamatory or cast Cooley in a false light:

Cooley "blatantly misrepresent[s] and manipulat[es] its employment statistics to prospective students, employing the type of 'Enron-style' accounting techniques that would leave most for-profit companies facing the long barrel of a government indictment and the prospect of paying a substantial criminal fine[;]"

Cooley "grossly inflates its graduates' reported mean salaries[.]"

(Compl., docket # 1–1.)

■ To determine whether any of these statements are actionable, the Court must first decide whether Cooley is a public figure. The record leaves no doubt that Cooley is at a minimum a limited purpose public figure. All of the factors articulated in *Wilson* are present here. A public controversy exists concerning the value of a law degree. The media has focused particularly in recent years on the challenging job market recent college graduates, and recent law school graduates, confront in the aftermath of the financial crisis of 2008. The American Bar Association has published articles and promoted discussion of the issue. Indeed, President Obama himself recently addressed the issue, proposing that law school be reduced from three years to two. Cooley participates voluntarily in this discussion: Cooley, like most law schools, recruits prospective law students in part by promoting employment prospects. Cooley plays a prominent role in the discussion: Cooley by its own description has the largest enrollment of any ABA-accredited law school. It maintains campuses throughout Michigan and in Florida.[7] And Cooley has ready access to channels of effective communication, including its website, advertisements, recruiting materials, written publications, and career services presentations. The Court finds that Cooley is a limited purpose public figure in the context of this lawsuit.

■ The Court finds further that the record does not permit a jury to find actual malice by the required clear and convincing standard. There is no record evidence that Mr. Anziska or the other Defendants had subjective knowledge that any of the statements at issue were false. *Harte–Hanks,* 491 U.S. at 667, 668, 109 S.Ct. 2678. Nor is there any evidence that Mr. Anziska or the other Defendants had any subjective awareness—let alone a "high degree" of awareness—of the probable falsity of any of the statements. *Id.* at 667, 109 S.Ct. 2678. On the contrary, the unrebutted record reflects that Mr. Anziska read a variety of articles, including articles by law professors; spoke and corresponded with law professors; reviewed published reports; and visited legal and other blogs before posting the statements at issue. Cooley contends that Mr. Anziska should have investigated more thoroughly before publishing any of the challenged statements, but this presumes incorrectly that a reasonably prudent person standard, not a subjective standard, applies. *See id.* ("[F]ailure to investigate before pub-

---

7. Cooley has also recently announced an affiliation agreement with Western Michigan University, bringing it into the ambit of a major state university. See http://www.cooley.edu/grandrapids/ (last visited September 23, 2013).

lishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard."). There is no record basis to conclude that Mr. Anziska or the other Defendants doubted the sufficiency of Mr. Anziska's investigation or veracity of his statements. Cooley also argues that Mr. Anziska had reason to doubt the truthfulness of some of the blog authors' and blog readers' posts and comments. Even if that is so, on this record Mr. Anziska's investigation was by no means limited to perusals of blogs and related posts. The Defendants actually did file the lawsuit with the challenged statements from the Draft Complaint, which is inconsistent with a subjective belief that the statements were false or likely false.

█ With respect to one statement, Cooley has not only opposed summary judgment for the Defendants, but also moved for summary judgment under FED. R. CIV. P. 56(f). The statement at issue is the claim that "there are reports that there [sic] students are defaulting on loans at an astounding 41 percent, and that the school is currently being investigated by the DOE for failing to adequately disclose its students' true default rates." The Court disagrees with Cooley and finds that Defendants are entitled to summary judgment even on this statement. First, the statement is qualified: it says "there are reports" of certain loan default rates and a DOE investigation; it does not directly assert the truth of the default rates and the investigation. Second, Defendants promptly retracted the statement upon request, and there is no evidence that they ever repeated it. Both of these things, in addition to the lack of evidence that Defendants subjectively doubted the veracity of the statement, weigh against any reasonable juror finding actual malice, let alone a finding by clear and convincing evidence.

█ Cooley's challenge to several statements fails for additional reasons. At least two statements fall within the protected category of exaggeration or hyperbole. These statements include the speculation that "most likely schools like Thomas Cooley will continue to defraud unwitting students unless held civilly accountable" and that Cooley "blatantly misrepresents and manipulates its employment statistics ... employing the type of 'Enron-style' accounting techniques that would leave most for-profit companies facing the long barrel of a government indictment and the prospect of paying a substantial criminal fine." Further, the statement that "Cooley grossly inflates its graduates' reported mean salaries" may not merely be protected hyperbole, but actually substantially true. *MacDonald v. Thomas M. Cooley Law School,* 880 F.Supp.2d 785, 794 (W.D.Mich.2012) (finding that the average starting salary for all graduates specified in Cooley's 2010 Employment Report "does not represent the average starting salary for 'all' graduates; nor does it even represent the graduates' average starting salary for whom Cooley knew the employment status. Standing alone, the representation is objectively untrue."); *MacDonald v. Thomas M. Cooley Law School,* 724 F.3d 654 (6th Cir.2013) ("We agree with the district court that this statistic is 'objectively untrue.'").

For all of these reasons, the Court concludes that Defendants are entitled to summary judgment on Cooley's claim of defamation.

### 2. Remaining Claims

█ In addition to its claim of defamation, Cooley brings claims of tortious interference with business relations; breach of contract; and false light against all Defendants. (Compl., docket # 1–1). Cooley premises each of these claims on the state-

ments that form the basis of the defamation claim. (*Id.* at ¶ 35; 42; 45.) These claims necessarily fail along with the defamation claim. The limits on the actionability of defamation claims, including, without limitation, the requirement that a public figure plaintiff demonstrate actual malice by clear and convincing evidence, are First Amendment limitations. *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 50–57, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). Accordingly, the "circuit courts have ... imposed the actual-malice standard on other tort claims predicated on defamatory speech," recognizing that the same constitutional protections apply. *Compuware v. Moody's Investors Services, Inc.,* 499 F.3d 520, 530 (2007). The Sixth Circuit also imposes the actual malice standard in breach of contract claims premised on activities protected by the First Amendment. *Id.* at 531. In light of the Court's determination that Cooley is a public figure unable to establish actual malice, Cooley's tort and breach of contract claims fail.

## Conclusion

For these reasons, the Court concludes that Defendants are entitled to summary judgment in their favor.

**ACCORDINGLY, IT IS ORDERED:**

1. Plaintiff's Motion for Leave to File Two Supplemental Exhibits (docket # 298) is **GRANTED.**

2. Defendants' Motions for Summary Judgment (docket # 184, 186, 200, 237) are **GRANTED** to the extent consistent with the Court's Opinion and **DISMISSED AS MOOT** in all other respects.

3. Defendant's Motion to Exclude Testimony of John S. Augusto (docket # 192) is **DISMISSED AS MOOT.**

4. Defendant's Motion to Exclude Testimony of David Jones (docket # 196) is **DISMISSED AS MOOT.**

5. Defendants' Motion to Strike the Supplemental Report of David Jones (docket # 293) is **DISMISSED AS MOOT.**